[Civ. No. 25455. Second Dist., Div. One. Feb. 26, 1962.]

Estate of EDITH H. BRASZ, Deceased. WALTER H. BARBER, Petitioner and Appellant, v. GILBERT O. HAACKE, Objector and Respondent.

Brandon & Marnell, Alfred W. Dibb and William M. Brandon for Petitioner and Appellant.

Alexander Ruiz for Objector and Respondent.

WOOD, P. J.—Appeal from order made upon hearing of final account of former executor, Walter H. Barber.

A purported will of Edith H. Brasz, dated February 9,

1957, was admitted to probate on April 1, 1957, upon the petition of Walter H. Barber, who was appointed executor.

On September 19, 1957, Gilbert O. Haacke and Charles A. Haacke filed a contest of the will. Pursuant to stipulation of the parties to the contest, the court rendered judgment revoking the order admitting the will to probate. That judgment also awarded costs in the amount of $218.87 to contestants against "respondents" therein.

On June 10, 1960, Gilbert O. Haacke filed a petition for probate of a will, dated July 7, 1956. That will was admitted to probate on July 8, 1960, and Gilbert O. Haacke was appointed administrator with-will-annexed.

On August 31, 1960, the former executor, Walter H. Barber, filed his final account and report. The account stated that the executor was chargeable as shown in the inventory and appraisement as follows: Cause of action on a certain insurance policy for $936; refund check from the insurance company for $4.03; clothing and household articles in possession of Gilbert and Charles Haacke; box containing $7.12 and miscellaneous papers; balance due from Gilbert Haacke on $300 loan; balance of $766 due from Mr. and Mrs. Hayes on loan; four certificates of unknown value, representing certain shares of stock in various corporations. The account also stated that the cash on hand was $148.88.

The credits claimed in the account were as follows: Costs of administration $97.15; funeral expenses $696.67. The account also stated that unpaid creditors' claims were: Dr. Lowe (physician) $225; General Hospital $1,014.08. It was also asserted that the claims were not paid because funds were not available.

Gilbert Haacke, as administrator, filed objections to the account wherein he alleged that the former executor had failed to list as an asset of the estate the following described property: Account No. 20978 in the Broadway State Bank in names of Walter Barber and Edith H. Brasz (decedent); a checking account in said bank in name of decedent; note of Walter Barber for $1,000 payable to decedent; money in Security Bank in names of Mrs. Fisher (daughter of executor) and decedent; loans to Mr. Fisher (son of executor) in amounts of $790 and $1,750; funds of decedent in City National Bank and Broadway State Bank held in names of Mr. and Mrs. Fisher; two diamond rings of decedent.

The account, No. 20978, in the Broadway State Bank which

was in the names of Walter Barber and the decedent was a joint tenancy account.

The court found that "there was no intention to make the disputed bank account [account No. 20978] one of joint tenancy with right of survivorship; rather the account included Barber's name so that he could handle decedent's financial affairs during her lifetime," and particularly so that he could see that the expenses of her last illness, her funeral, and debts were paid; that the balance in the account at the time of her death was $1,384.11. The court ordered that said sum be accounted for by the executor as an asset of the estate.

Another finding was that the two diamond rings are the property of the estate.

It was also found that the $1,000 note signed by Barber had been paid; that the estate had no interest in Barber's checking account; the executor (Barber) is entitled to credit for the amounts of $696.67 and $168.68 for funeral expenses, and for $97.15 for expenses of administration. The court directed the new executor to pay the physician's claim of $225, the claim of the General Hospital (County of Los Angeles), and to pay expenses of administration (costs in will contest judgment) in amount of $218.87. It was also directed that the "new executor may retain check [for $170.56, hereinafter referred to] until final accounting is had by former executor." The court ordered that the executor (Barber) file a new accounting in accordance with "this opinion" within 10 days.

The findings and orders above referred to were in a minute order of November 15, 1960. The appeal herein is "from certain Order made on November 15, 1960."

Appellant contends that the court erred (1) in ordering him to account for the $1,384.11 which is in the joint tenancy bank account; (2) in ordering him to account for the two diamond rings; and (3) in directing that the new executor (administrator) may retain the county check for $179.56 until the final accounting by the former executor.

With reference to the contention regarding the joint tenancy account, appellant asserts that his testimony shows that decedent knew the nature of the account, and that they had discussed the account and had signed the joint tenancy card; that the testimony of Mr. Dibb, who was decedent's attorney, was that decedent was fully advised by him as to the legal effect of a joint tenancy bank account, and that it was her

intention that appellant should receive the money if he survived her.

Appellant's wife and the decedent were sisters. Decedent's husband died in October 1955. About two months thereafter (about January 1, 1956) she sold her home in Glendale, and then she lived in Long Beach about three months. Then she lived with a family in Glendale and did housework there until November 1956, when she went to live at the home of her son Gilbert Haacke, where she stayed about three months. Then (about February 1, 1957) she went to live at the home of appellant and his wife. She died March 1, 1957.

Appellant testified as follows: The joint tenancy bank account was opened on January 16, 1956, which was soon after she sold her home. The money in that account was her money. She put the money in that account so that money would be available for hospital and burial expenses—more so for hospital expense than burial. She "put money in the joint account for me to pay bills with." When she wanted money he would give it to her from his own funds, and thereafter when he was at the bank he would transfer money from the joint account to his own account. When she received checks he would deposit them in the joint account—she had no way to get to the bank. He "did that as an accom[m]odation" to decedent. On March 2, 1956, he borrowed $1,000 from the joint account for 90 days, and he made a promissory note for that amount. He repaid that amount in July 1956, with $20 additional as interest, by depositing that amount in the joint account. He could have borrowed the money from a bank or someone, but he helped her a little. He and decedent signed the joint tenancy card. He knew that a joint tenancy "had survivor rights." They discussed the joint tenancy at the bank. Loans were made from the account to Mr. Fisher ($100) and to Mr. and Mrs. Hayes ($1,195.80), and the money was collected by appellant and was put in the account. On February 4, 1957, decedent executed a power of attorney wherein appellant was appointed as her attorney in fact. While she was working in Glendale her hands were swollen with arthritis and she could not work any more. She was not sick until a week or two before she was operated on—she was not in bed, and did not need help to go to the hospital. He took her to the hospital.

Mr. Dibb, attorney at law, testified in substance that: In the first part of February 1957 Mrs. Brasz said that she wanted to get her affairs in order, that she had a joint tenancy

account with her brother-in-law (appellant), that she did not own any real property, that she had a paid-up life insurance certificate. She also said that she wanted to execute a power of attorney to have appellant act with full powers. At that time appellant and Mr. Fisher (appellant's son-in-law) were in the waiting room. He (witness) asked her if she also wanted appellant to act as executor. She replied in the affirmative. In response to questions as to how she wanted her property handled, she said that her one object was to see that all of her bills were paid and that she had a proper burial in the family plot in Utah. He asked her concerning the joint tenancy account with appellant. She said she would like for him (appellant) to have it as a separate account. He (witness) said there was nothing wrong with leaving it as it is, "because it would——become a part of her estate on her death and would automatically pass to the surviving joint tenant, to Walter Barber." She said that is exactly the way she wanted it. He prepared the power of attorney that evening, and it was executed in his office. He prepared the will and forwarded it at a later date with instructions as to execution. He had never seen her prior to that time. She was a rather alert person for her age, and she appeared to be aware of everything that was going on and of the nature and extent of her estate. She understood that the joint tenancy account would not become a part of her estate. On cross-examination, he testified that she did not tell him that she was going to undergo surgery, nor that Mr. Hayes or Mr. Fisher owed money to her, nor that she had a bank account with Mrs. Fisher. She was in his office about 7:30 o'clock in the evening.

Gilbert Haacke testified that he had been advancing money to his mother (decedent) from 1951 to approximately the time of Mr. Brasz' death; after his mother's house was sold, a family conference was held and as a result thereof $3,145 from the proceeds of the house sale was paid to him as repayment of the money advanced; they also agreed at that conference that they would let appellant handle decedent's affairs at that time; while decedent was living at his (Gilbert's) home she was in poor health, her hands were swollen with arthritis, and she could hardly bend them; a physician made a diagnosis that she had an intestinal tumor, and said that she should have an operation; from November 1956 to February 1957 her condition became worse, she lost weight, and was very thin and rundown; on February 4, 1957, and prior thereto, persons could impose their will upon her; she went to a hospital in

February (and an operation was performed); after she left the hospital she was at the home of appellant about a week.

 Appellant's position with respect to the joint tenancy account is that the provisions stated on the account card are controlling. He does state, however, that parol evidence may be received to show the intent of the decedent. In *American Trust Co.* v. *Fitzmaurice*, 131 Cal.App.2d 382 [280 P.2d 545], it was said at page 387: "However the agreement with the bank is not an incontestable proof of the intention to create a present joint interest notwithstanding, as in this case, all the funds had belonged to one of the parties. Parol evidence remains admissible to show the intention and the 'realities of ownership.' [Citations.] On the basis of the evidence stated the trial court could, as in the *Comastri* case, hold that there was no intention to make a gift of the funds in the account prior to Mrs. Temps' death. Although Mrs. Temps did not testify specifically as to each item in issue, the court could conclude from the general tenor of her testimony that she did not intend to part definitely with her property, which she thought she might still need in the ensuing years of sickness. This applies as much to property placed in the joint name of herself and appellant Frank as to property placed in his name alone." In the present case it is conceded that the money in the account had belonged to decedent. Appellant did not testify that a gift of a present joint interest in the money was made to him. He did not assert a claim of a present joint interest in the money was created. He testified to the effect that Mrs. Brasz put the money in the account so that money would be available for hospital expenses and for him to use in paying bills; when she wanted money he would give it from his own funds, and thereafter when he was at the bank he would transfer money from the account (it was a *savings* account) to his own account; he deposited her checks in the joint account; he did that as an accommodation. He made a loan of $1,000 to himself from the account, and he made a promissory note for that amount payable to her with interest. He paid the note and interest by depositing the amount in the account. He said, in effect, that he could have borrowed the money elsewhere, but he helped her a little by borrowing it from the account. The making of that loan to himself indicates that he did not claim to be coowner of the account. He paid her bills or expenses, including funeral expenses, from the account. The trial court could reasonably conclude from the evidence that appellant did not exercise

any act of ownership of the money, but, on the contrary, his acts in connection with the account were in recognition of her ownership and were for her benefit, convenience, and accommodation. The evidence presented a factual question as to the intention of the decedent. The finding of the court with respect to the intention of the decedent in creating the account is supported by substantial evidence.

 With respect to appellant's contention that the court erred in ordering him to account for the two rings, appellant argues that the evidence shows that the decedent gave the rings to Mrs. Barber.

Mrs. Barber, wife of appellant and sister of decedent, testified as follows: Decedent had the two diamond rings when she moved to Mrs. Barber's house and she kept them until she went to the hospital. "She just gave them to me as a gift and I still have them." On cross-examination, the witness said that the transaction occurred approximately a day after decedent returned from the hospital, which time was about five days before Mrs. Brasz died. When the witness was asked what Mrs. Brasz said when she gave the rings, the witness replied: "She wanted me to have her rings." On redirect examination, the witness said that when Mrs. Brasz came home from the hospital she was in good spirits.

Appellant's position with respect to the rings is that the order of the court is contrary to the only evidence regarding the gift of the rings. "It is the law that when the claim of gift is not asserted until after the death of the claimed donor, the burden is on the donee to show by clear and satisfactory evidence every element necessary to constitute a gift." (*Estate of McSweeney,* 123 Cal.App.2d 787 [268 P.2d 107].) In the present case the testimony did not include an express statement that the rings were delivered to the witness. From the testimony that the witness "still" has the rings, it might be inferred that they were delivered. The question arises as to whether the court acted arbitrarily in determining the issue as to gift. In *Lord* v. *Katz,* 54 Cal.App.2d 363 [128 P.2d 907], it was said at page 366: "The solution of this question [rejecting uncontradicted testimony] must be found in a determination whether the facts presented bring this case within the well settled rule that the court may not arbitrarily reject the uncontradicted testimony of a witness or the equally well settled exceptions to said rule that such testimony may be disregarded when it is inconsistent with surrounding circumstances or where inconsisten-

cies in the witness's testimony or his manner of testifying or the inherent improbalilities of the testimony justify such action. . . . This determination must be made in the light of the rule that 'every element necessary to constitute a gift must be sustained by explicit and convincing evidence.' '' In view of the lack of an express statement of delivery of the rings, the court might have considered that the element of delivery was not proved by explicit and convincing evidence. Under such a circumstance, it cannot be said that the court acted arbitrarily in determining the issue as to gift.

 Another contention of appellant is that the court erred in directing that the new administrator may retain the county check until the final accounting by the former executor. Before stating appellant's argument regarding this contention, additional facts should be stated. As above shown, the judgment (rendered pursuant to stipulation), revoking the order admitting the 1957 will to probate, awarded costs in the amount of $218.87 against ''respondents.'' Soon after that judgment was entered, the contestants caused an execution on the judgment for costs to be levied upon the personal bank account of Walter Barber, one of the ''respondents.'' Pursuant to the levy, $170.56 was obtained from the bank and a county check for that amount was sent to counsel for the contestants. Thereafter, upon motion of the respondents in the will contest, the judgment therein was amended *nunc pro tunc* to read that the costs ''are awarded . . . out of the property and estate of said decedent. . . .'' (Instead of being awarded against respondents personally.) Thereafter, upon application of counsel for Mr. Barber, an order was issued directing Gilbert Haacke and his counsel to show cause why they should not be adjudged guilty of contempt of court for disobeying the judgment *nunc pro tunc* (which omitted the award of costs against respondents personally). Thereafter, Gilbert Haacke petitioned the court for instructions as to the disposition of the county check for $170.56 which was sent to his counsel after the levy of execution. The order to show cause regarding contempt of court, and the petition for instructions, came on for hearing at the same time the objections to the account came on for hearing.

Appellant argues that since the check for $170.56 was obtained under an execution issued upon the erroneous judgment for costs, the check ''admittedly was not'' the property of Gilbert Haacke or the estate; and that there is no apparent reason for permitting ''the funds'' to remain in the possession

of Mr. Haacke or his counsel. As above shown, the court ordered the former executor, Mr. Barber, to file a new accounting; and also directed that the new administrator may retain the check until that final accounting. It thus appears that the order regarding the check was not a final determination as to the disposition of the check. It was within the discretion of the court to make said order regarding the check.

The minute order from which the appeal is taken is affirmed.

Fourt, J., and Lillie, J., concurred.