Filed 10/13/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| Estate of BETTY LOU O'CONNOR, Deceased. | B272085 |
| _____ | (Los Angeles County Super. Ct. No. BP142284) |
| KELLI ANNE PARILLE, | |
| Petitioner and Respondent, | |
| v. | |
| THOMAS WILLIAM O'CONNOR, | |
| Objector and Appellant. | |


APPEAL from an order of the Superior Court of Los
Angeles County, David J. Cowan, Judge.  Affirmed.

Sohaila Sagheb for Objector and Appellant.

Bryan Cave, Edward M. Rosenfeld, Timothy L. Hayes
and Aaron B. Ginsburg for Petitioner and Respondent.

In the last years of her mother's life, daughter Kelli Anne Parille visited on a near daily basis, scheduling her mother's caregiving and hospital transportation. She also assisted with various business affairs, including opening a joint bank account with her mother. The issue on appeal is one courts have long grappled with—when an elderly person with a joint bank account dies, do the funds belong to the decedent's estate or do they belong to the additional signer as a co-owner of the account? Under California law, "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving party . . . as against the estate of the decedent unless there is clear and convincing evidence of a different intent." The trial court held that because there was no clear and conclusive evidence of a contrary intent, the accounts passed as a matter of law to Kelli upon her mother's death. Because the trial court's finding is supported by substantial evidence, we affirm.

## BACKGROUND

On June 27, 1990, William and Betty Lou O'Connor created the O'Connor Family Trust (OFT). The OFT was amended in 1992. William and Betty had three children—Thomas Williams (Tom), Kelli Anne Parille (Kelli) and William Kevin (Chip)—who were equal residual beneficiaries of the OFT if they survived the surviving spouse. William died in 1994. Chip died in 2004.[1] On August 1, 2006, Betty

---

[1] Although this date is not in the record on appeal, it is also not in dispute.

created the Betty Lou O'Connor Trust (BLOT). Tom, Kelli, and Chip's two children are equal residual beneficiaries of the BLOT.

Betty died in 2012. Until her death, Betty remained Trustee of the OFT and BLOT. Upon Betty's death, Annette Gomez became the Successor Trustee of the OFT and John Weitkamp became the Successor Trustee of the BLOT. Weitkamp was also the Executor of Betty's estate. Gomez signed and prepared Betty's federal estate tax return using IRS form 706, while Weitkamp signed and filed the form 706. When Gomez became Successor Trustee of the OFT, she asked Kelli to disclose all the accounts belonging to Betty. According to Gomez, Kelli told her that Betty's estate included two Wells Fargo accounts—accounts that had been opened in October 2008 and contained approximately $477,218 at the time of Betty's death.[2]

Tom contends that the Wells Fargo accounts are BLOT assets. According to Kelli, however, the accounts do not belong to the BLOT. Instead, they were Betty and Kelli's joint accounts while Betty was alive and now belonged entirely to Kelli as the joint owner with right of survivorship. The sole issue on appeal is whether Betty intended to create joint accounts with the right of survivorship in favor of Kelli when she opened the accounts, thus exempting the asset from the BLOT.

---

[2] As discussed below, Kelli denies she disavowed her ownership interest in the Wells Fargo accounts.

Kelli saw her mother Betty five to six times a week during the last several years of Betty's life.  She organized Betty's life, scheduling Betty's caregiving and hospital transportation.  Betty opened the Wells Fargo accounts while Kelli was assisting Betty with various business affairs.  According to Kelli, Betty asked Kelli to meet her at the bank to open the accounts and "put my name on it with her."  Kelli testified she signed the signature card with Betty and Betty indicated the money in the accounts was for Kelli's use.  Kelli maintained she had "complete access" to the two accounts.  Although Wells Fargo could not find a signed signature card for the accounts, it did find an unsigned consumer account application and legal name change request for the accounts.[3]  The consumer account application expressly listed Betty the primary joint owner of the accounts and Kelli the secondary joint owner.  Kelli later submitted a declaration stating that she had signed, and had witnessed Betty signing, the consumer account application.

The trial court ultimately declined to find that Betty and Kelli had signed signature cards when opening the Wells Fargo accounts.  Nevertheless, the court did find that the accounts were joint accounts and that, upon Betty's

---

[3] According to Wells Fargo, the opening of the accounts indicated that Betty and Kelli's signatures must have been collected at one point in time.  The legal name change request simply corrected the spelling of Betty's last name from "O'Conner" to "O'Connor"

death, the funds in the accounts were owned by Kelli.[4]  In short, the court determined, "[t]here being no clear and conclusive evidence of a contrary intent, on the death of Betty Lou O'Connor said accounts passed as a matter of law to Kelli [O'Connor] Parille."

According to Tom, the trial court erred in granting Kelli's petition seeking ownership of the accounts because: (1) there are no executed documents reflecting Betty's intent to create joint accounts with the right of survivorship in favor of Kelli and a joint account cannot be created orally; and (2) none of the unsigned documents produced by Wells Fargo indicate the creation of a joint account with the right of survivorship.

## STANDARD OF REVIEW

We review questions of law de novo.  (*County of Yolo v. Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1248.)  However, "[w]hen the trial court has resolved a

---

[4] The trial court initially ordered that the funds be deposited in an interest-bearing, federally insured blocked account.  The order was interlineated to state:  "Nothing herein is intended as a determination of the rightful ownership of the funds."  The trial court subsequently entered a stipulated order releasing  the funds from the blocked account to BLOT Trustee, John Weitkamp with directions to distribute under the terms of the BLOT (1/3 to Kelli, 1/3 to Tom and 1/3 to Chip's two children).  The order provided that "nothing in this Order shall prevent . . . Kelli . . . from bringing a Petition seeking full ownership of the . . . funds."

5

disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule.  If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed."  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

In applying the substantial evidence standard of review, " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.  [Citation.]  We must therefore review the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court."  (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.  [Citations.]  'Substantial evidence . . . is not synonymous with "any" evidence.' . . . [Citations.]  The focus is on the quality, rather than the quantity, of the evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) Consequently, we do not evaluate the credibility of the witnesses.  (*Lenk v. Total–Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  Rather, "we defer to the trier of fact on issues of credibility."  (*Ibid.*)

"Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn." (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at p. 631.)

The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial. (See *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [implied findings].) The doctrine of implied findings provides that a "party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party . . . [I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient . . . and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134, fn. omitted.)

Alternatively stated, the doctrine (1) directs the appellate court to presume that the trial court made all factual findings necessary to support the judgment as long as substantial evidence supports those findings and (2) applies unless the omissions and ambiguities in the statement of decision are brought to the attention of the superior court in a timely manner. (*In re Marriage of*

*Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2016) ¶ 8:57, p. 8–28.)

**DISCUSSION**

## I.    Applicable Statutes

The first law in California concerning joint tenancy assets was Civil Code section 683, which was enacted in 1872 and read as follows:  " 'A joint interest is one owned by several persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy, or when granted or devised to executors or trustees as joint tenants.' " (*Denigan v. San Francisco Sav. Union (*1899) 127 Cal. 142, 149.)  Initially, Civil Code section 683 was applied to cases concerning bank accounts, real property, and other types of personal property. (See *Denigan,* at p. 142 [bank account]; *Estate of Harris* (1915) 169 Cal. 725 [bank account, stock certificates, promissory note], *Siberell v. Siberell* (1932) 214 Cal. 767 [real property].)  In 1935, section 683 was amended by adding the following sentence:  "A joint tenancy in personal property may be created by a written transfer, instrument or agreement."  Before the 1935 amendment, joint tenancies in personal property could be created by both oral and written agreements.  After the 1935 amendment, joint tenancies could be created only by a writing.  (*California Trust Co. v. Bennett* (1949) 33 Cal.2d 694. 696–697.)  Up until July 1, 1990, section 683 was the sole statutory authority governing

8

the character and ownership of funds on deposit in joint tenancy bank accounts.[5]

In 1990, however, the California Multiple-Party Accounts Law (CAMPAL), Probate Code section 5100 et seq., became the governing statute for such accounts. (*Lee v. Yang* (2003) 111 Cal.App.4th 481, 489.) Under CAMPAL, multiple party accounts include joint accounts. (Prob. Code, § 5132, subd. (a).) " 'Joint account' means an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship." (Prob. Code, § 5130.) Checking accounts, savings accounts, and certificates of deposit all come within the CAMPAL definition of "account."[6] (Prob. Code, § 5122,

---

[5] Nevertheless, in the decades following the enactment of section 683, application of the statute to joint tenancy bank accounts had been undercut by cases holding that no writing was required, and that parol evidence was allowed to show the intent of the parties and the realities of ownership of the account. (See *Estate of Brasz* (1962) 200 Cal.App.2d 691, 697–698; *Manti v. Gunari* (1970) 5 Cal.App.3d 442, 453.)

[6] Concomitantly, Civil Code section 683 was amended to provide that the statute did not apply to joint accounts under CAMPAL. (Civ. Code, § 683, subd. (b).) In other words, application of section 683 to CAMPAL accounts was now specifically prohibited. Subsequent cases have confirmed the application of CAMPAL to the exclusion of section 683. (See, e.g., *Estate of Castiglioni* (1995) 40 Cal.App.4th 367, 383–384.) Indeed, since 1990, no reported cases have applied section 683 to bank accounts. Thus,

9

subd. (a).)  "Words in substantially the following form in a signature card, passbook, contract, or instrument evidencing an account, or words to the same effect," can create a joint account if "executed before, on, or after July 1, 1990"—"This account or certificate is owned by the named parties.  Upon the death of any of them, ownership passes to the survivor(s)."  (Prob. Code, § 5203, subd. (a).)

However, use of the form language is not necessary to create a joint account under CAMPAL.  "If the contract of deposit creates substantially the same relationship between the parties as an account created using the form language provided in this section, this part applies to the same extent as if the form language had been used."  (Prob. Code, § 5203, subd. (b).)  Notably, "an account payable on request to one or more of two or more parties is treated as a joint account under this part *even though* no mention is made of any right of survivorship unless the terms of the account or deposit agreement otherwise provide."  (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 5302, p. 624, italics added.)[7]

Finally, survivorship interests in multiple-party accounts are governed by section 5302, which reads in

Tom's reliance on, and repeated citations to, this particular statute is misleading and inapposite.

[7] The California Law Revision Commission's official comments are entitled to substantial weight when interpreting a statute.  (See *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 62.)

relevant part: "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving party . . . as against the estate of the decedent unless there is clear and convincing evidence of a different intent." (Prob. Code, § 5302, subd. (a).) No writing is required to create this right. "The right under this part of a surviving party to a joint account . . . to the sums on deposit on the death of a party to a multiple-party account shall not be denied, abridged, or affected because such right has not been created by a writing executed in accordance with the laws of this state prescribing the requirements to effect a valid testamentary disposition of property." (Prob. Code, § 5304.) Furthermore, section 5302, subdivision (a), "creates a right of survivorship in a joint account *whether or not* the account is described as a 'joint tenancy' or mentions any right of survivorship." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 5302, p. 624, italics added.) As noted above, the right of survivorship created by subdivision (a) may be rebutted only by clear and convincing evidence of a different intent.[8] (*Ibid.*)

---

[8] "This strengthen[ed] survivorship rights, since under prior law the presumption of survivorship arising from the joint tenancy form of the account could be overcome by only a preponderance of the evidence." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 5302, p. 624, italics added.)

## II. Substantial Evidence Supports the Trial Court

The issue on appeal is one courts have long grappled with—when an elderly person with a joint bank account dies, do the funds belong to the decedent's estate or do they belong to the additional signer as a co-owner of the account? In hundreds of reported cases, courts have been required to determine a bank depositor's intent at the time the depositor opened the joint account or added an additional signer to an already-existing account. (See Ann., Deposit of Fund Belonging to Depositor in Bank Account in Name of Himself and Another (1994) 149 A.L.R. 879, 880–881.)

In such cases, "[t]he heirs or beneficiaries contend that the bank account belongs to them because the decedent only wanted someone to be available to sign in emergencies and did not intend the additional signer to receive the account at death. These parties urge the court to ignore the express or implied survivorship feature of the bank account and distribute the funds according to the decedent's will or trust, or according to state intestacy statutes. On the other hand, the additional signer claims ownership as surviving joint tenant. Because the funds automatically belong to the survivor under the rules of joint tenancy, no funds from the account exist to pass to the decedent's estate." (Gregory Eddington, *Survivorship Rights in Joint Bank Accounts: A Misbegotten Presumption of Intent*, 15 Marquette Elder's Advisor 175, 176 (2014) (hereinafter Surviorship Rights).)

"The most common rule is that funds remaining in a 'joint account' belong to the survivor, absent clear and

12

convincing evidence of the deceased depositor's contrary intent." (Surviorship Rights, *supra*, 15 Marquette Elder's Advisor at p. 195.) As discussed above, California follows this rule. (*Id.* at p. 195, fn. 81.) However, as commentators have noted, "Presuming that the depositor intends survivorship rights ignores the plausible alternative reasons for opening the account." (*Id.* at p. 196.) "This presumption of survivorship rights is inconsistent with the analogy to wills formalities because the bank account formalities are not convincing indications of intent to transmit property at death." (*Id.* at pp. 196–197.) Nevertheless, "[a]s in other types of cases requiring clear and convincing evidence, the presumption is difficult to overcome." (*Id.* at p. 197.)

Here, the trial court found that the presumption of survivorship rights had not been overcome. Given that there was no clear and conclusive evidence of a contrary intent, the court held that the accounts had passed as a matter of law to Kelli upon Betty's death. The trial court's finding is supported by substantial evidence. As noted above, Betty opened the Wells Fargo accounts while Kelli assisted Betty with various business affairs. Betty indicated to Kelli that the money in the two accounts was for Kelli's use and Kelli had complete access to the accounts. Wells Fargo confirmed that both Betty and Kelli had "withdrawal rights" on the accounts. The consumer account application listed Betty as the primary joint owner of the accounts and Kelli as the secondary joint owner. Kelli said she had signed, and had witnessed Betty signing, the consumer account application.

13

A Wells Fargo officer authenticated the unsigned copy of the application.

On appeal, Tom points to contradictory statements made by Kelli regarding ownership of the accounts, specifically pointing to comments Kelli allegedly made during preparation of IRS form 706. Form 706, the "Federal Estate Tax Return," specifically asks whether the decedent owned any property as a joint tenant with the right of survivorship at the time of death. The form 706 that Annette Gomez prepared after Betty's death answered this question in the negative. Later in the form 706, Gomez stated that Kelli "did not claim any share of ownership" of the two Wells Fargo accounts. Kelli disputes this portion of the chronology. According to Kelli, Gomez had asked Kelli for permission to access the accounts for tax purposes after Betty died. Kelli told Gomez at that time: "You know, these accounts are mine. I'm going to give you limited access to this to do what you need to do." Gomez said she understood. Kelli later changed the account passwords so that Gomez could no longer access the accounts.[9]

---

[9] Betty and Kelli also jointly held two Bank of the West accounts. According to the form 706, Kelli "did not claim any share of ownership" of these accounts either. Kelli later testified this statement was accurate, unlike her purported disclaimer of the Wells Fargo accounts. According to Kelli, the Bank of the West accounts consisted entirely of "business funds" and was "not [her] money." Conversely, the Wells Fargo accounts were for Betty's and Kelli's use and "were never used for business purposes." Thus, according to Kelli,

14

In short, Tom claims that Kelli had no expectation of receiving the money in the Wells Fargo accounts—and thus disclaimed any ownership interest in the accounts when Gomez prepared the form 706—until Wells Fargo told Kelli (after the form had been mailed) that the funds belonged to her. It was then that Kelli changed the passwords on the accounts. In other words, Betty never told Kelli that the money belonged to her—only Wells Fargo did so after Betty's death. As noted above, Kelli contends that she informed Gomez the accounts belonged to her before the form 706 was prepared. Furthermore, Gomez herself later downplayed Kelli's alleged verbal disclaimer, stating it "was not a relinquishment of [Kelli's] rights to the account because she did not disclaim the account in writing within nine months of [Betty's] death, or deliver a written disclaimer to the bank."[10] Indeed, Gomez subsequently contacted Wells Fargo

Betty did not intend that Kelli have survivorship rights in the Bank of the West accounts. Consequently, Kelli sent Weitkamp, the BLOT Trustee, the proceeds of the accounts—approximately $267,000.

[10] Gomez cited Probate Code sections 278, 279 and 280 in support of this determination. Section 278 provides that a disclaimer must be in writing and signed by the disclaimant. It must also identify the creator of the interest, describe the interest to be disclaimed, and state the disclaimer and the extent of the disclaimer. Section 279 provides that a disclaimer must be filed "within a reasonable time after the person able to disclaim acquires knowledge of the interest." (Prob. Code, § 279, subd. (a).) With respect to an interest

15

and confirmed that the two accounts were held in joint tenancy and that, upon Betty's death, the accounts "automatically belonged solely" to Kelli.

Moreover, it is not our role to reweigh the evidence proffered during this particular factual dispute or evaluate the credibility of the witnesses. That is the province of the trier of fact. (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at pp. 630–631.) In addition, we note that even if Betty did not expressly inform Kelli that the accounts would belong to Kelli after Betty's death, this would not change the legal analysis. Under California law, the presumption is that "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving

---

created by surviving the death of another joint tenant, "a disclaimer is conclusively presumed to have been filed within a reasonable time if it is filed within nine months after the death of the creator of the interest or within nine months after the interest becomes indefeasibly vested, whichever occurs later." (Prob. Code, § 279, subd. (b), (b)(6).) Section 280 provides that a disclaimer must be filed with any of the following: "(1) The superior court in the county where the decedent's estate is administered or, if there is no administration of the decedent's estate, the superior court in any county where administration of the decedent's estate would be proper. [¶] (2) The trustee, personal representative, other fiduciary, or person responsible for distributing the interest to the beneficiary. [¶] (3) Any other person having custody or possession of or legal title to the interest. [or] [¶] (4) The creator of the interest." (Prob. Code, § 280, subd. (a)(1)-(4).)

16

party . . . as against the estate of the decedent." (Prob. Code, § 5302, subd. (a).) In order to rebut the presumption, Tom had to present clear and convincing evidence of a different intent. (*Ibid.*) As the trial court determined, Betty's purported silence on the matter did not satisfy this exacting standard.[11]

## III. Other Issues on Appeal

### A. *Admission of Unsigned Documents*

Tom also contends the trial court abused its discretion and committed reversible error by admitting the consumer account application and legal name change request into evidence. Specifically, Tom claims that the unsigned documents were not properly authenticated, were without foundation, and were hearsay.[12] " 'An abuse of discretion

---

[11] Indeed, "clear and convincing" evidence requires a finding of high probability. This standard is not new. More than 100 years ago, we described such a test as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Sheehan v. Sullivan* (1899) 126 Cal. 189, 193.) Tom's declaration that Betty commonly titled accounts in her children's names as a matter of convenience, rather than a method of passing ownership, was either not credited by the trial court at all or was insufficient to rebut the presumption of ownership. Once again, we defer to the trier of fact on issues of credibility. (*Lenk v. Total–Western, Inc., supra,* 89 Cal.App.4th at p. 968.)

[12] Tom also contends that the documents "failed to contain any information from which it would be gleaned that

---

occurs "where, considering all the relevant circumstances, the court has exceeded the bounds of reason or it can fairly be said that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 898–899.)  We presume that the trial court order is correct, and imply findings that are necessary to support the judgment.  (*Bravo v. Ismaj* (2002) 99 Cal.App.4th 211, 219.)

Tom's hearsay claim is without merit.  Under the business record exception to the hearsay rule, "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the . . . rule when offered to prove the act, condition, or event if:  [¶]  (a) The writing was made in the regular course of a business;  [¶]  (b) The writing was made at or near the time of the act, condition, or event;  [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; [and]  [¶]  (d) the sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1271, subd. (a)-(d).)

---

Betty intended to create joint accounts with the right of survivorship in favor of Kelli."  However, as discussed above, the very fact that these were joint accounts created the presumption of this right under California law.  (Prob. Code, § 5302, subd. (a).)  Indeed, Probate Code section 5302, subdivision (a), creates a right of survivorship in a joint account whether or not the account mentions any right of survivorship.  (Prob. Code, § 5302, Cal. Law Revision Com. com.)

A trial court has wide discretion in determining whether a qualified witness possesses sufficient personal knowledge of the identity and mode of preparation of documents for purposes of the business records exception. (*Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 797 & fn. 28.)  Indeed, "any 'qualified witness' who is knowledgeable about the documents may lay the foundation for introduction of business records—the witness need not be the custodian or the person who created the record." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 324.)  Thus, a qualified witness need not be the custodian, the person who created the record, or one with personal knowledge in order for a business record to be admissible under the hearsay exception.  (See *id.* at p. 322; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 243, p. 1108.)

Furthermore, "bank statements prepared in the regular course of banking business and in accordance with banking regulations are in a different category than the ordinary business and financial records of a private enterprise." (*People v. Dorsey* (1974) 43 Cal.App.3d 953, 960.)  Consequently, even if mistakes are made in the entries on bank statements, "such matters may be developed on cross-examination and should not affect the admissibility of the statement itself." (*Id.* at p. 961.)

Here, Wells Fargo Assistant Branch Manager Gabriel Vallarta testified that the bank had pulled the records on the two accounts and that although it could not locate a signed signature card, it was Wells Fargo's practice to collect

signatures before an account could be opened. Furthermore, Vallarta noted, "[t]here are situations in which we can make an exception to open the account as long as we do collect those signatures at a future date." In this instance, the opening of Betty and Kelli's joint account indicated that "the signatures had to have been collected at one point in time." In addition, Kelli stated she and Betty both signed the consumer account application, a document that was dated October 1, 2008—five years before Betty's death.[13] Given this quantum of evidence, we cannot say that the trial court "exceeded the bounds of reason" in admitting the documents into evidence or that "no judge would reasonably make the same order under the same circumstances." (See *In re Marriage of Bower*, *supra*, 96 Cal.App.4th at pp. 898–899.)

---

[13] We also note that even if the application was missing in its entirety, "[t]he content of a writing may be proved by otherwise admissible secondary evidence." (Evid. Code, § 1521, subd. (a).) Indeed, oral testimony regarding the content of a writing is admissible "if the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence." (Evid. Code, § 1523, subd. (b).) To that end, courts have admitted a standard form of the lost document. (See *Kenniff v. Caulfield* (1903) 140 Cal. 34 [blank form used in drafting lost deed]; see also *Rogers v. Prudential Ins. Co.* (1990) 218 Cal.App.3d 1132, 1137 [lost or destroyed document may be shown by an unsigned copy or oral evidence].)

## B.    *Creation of Joint Accounts*

Probate Code section 5203, subdivision (a), requires an executed writing.  As noted by Tom, subdivision (b) of the statute does not abrogate this requirement, but rather permits a contract of deposit to be substituted for the other types of writing identified in subdivision (a) which can be used to create a joint account with the right of survivorship.  Given that the trial court expressly found that the accounts were joint accounts, which belonged to Kelli upon Betty's death, the trial court must have impliedly found that Betty and Kelli signed the consumer account application.  Tom did not object to this portion of the trial court's ruling.  Thus, Tom cannot appeal these particular findings here.  (See *In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1138.)

Tom next contends that even if the consumer account application had been signed, Kelli would not have been entitled to the accounts' funds because a joint account held by multiple parties is presumed to be a tenancy in common rather than a joint account with the right of survivorship.  As discussed in detail above, this is not the law in California.  Therefore, Betty did not need to explicitly designate the joint accounts as joint accounts with the right of survivorship in order for Kelli to receive this right.  (See Prob. Code, §§ 5203, subd. (b), 5302, subd. (a).)

As noted above, the consumer account application listed Betty as the primary joint owner and Kelli as the

21

secondary joint owner of the accounts.[14] Betty indicated the money in the accounts was for Kelli's use and Kelli had "complete access" to the two accounts. Wells Fargo confirmed that both Betty and Kelli had "withdrawal rights" on the accounts. Because the consumer account application created substantially the same relationship between the parties as an account created using the form language, section 5203 applies to the same extent as if the form language had been used. (See Prob. Code, § 5203, subd. (b).)

### C. *Betty's Course of Conduct*

Tom contends that had Betty wanted to make a devise to Kelli, it would not have been through "vague documents created by the bank." Rather, Betty, as a sophisticated businessperson, would have made a specific devise through the BLOT, as she did for other beneficiaries. Furthermore, Tom claims, had Betty intended to gift the funds in the accounts to Kelli, she would have told her so, and transferred the funds to Kelli while still alive. As the trial court determined, "[s]uch a speculative possibility falls short of clear and convincing evidence" of a contrary intent. (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 847.)

---

[14] Tom claims that the consumer account application contains "[t]he mere word 'owner' "—thus creating a tenancy in common—when the application clearly lists Betty and Kelli as joint owners.

22

**DISPOSITION**

The order is affirmed.  The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:



CHANEY, Acting P. J.



LUI, J.