Filed 11/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GLOBAL PROTEIN PRODUCTS, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KEVIN K. LE et al., <br><br> Defendants and Appellants; <br><br> THE VPS COMPANIES, INC., et al., <br><br> Interveners and Respondents. | H044628 <br> (Santa Clara County <br> Super. Ct. No. 105CV043903) |

Appellants Kevin K. Le and West Coast AG, LLC (WCA)[1] appeal from the trial court's denial of their renewed motion to dissolve a stipulated permanent injunction filed pursuant to Code of Civil Procedure section 1008, subdivision (b).[2] The stipulated permanent injunction prohibits appellants from acquiring, disclosing, or using a trade secret developed by respondent Global Protein Products, Inc. (GPP). According to appellants, dissolution of the stipulated permanent injunction under section 533 is required because recently discovered evidence demonstrates that GPP does not have a valid trade secret. Thus, appellants claim that the underlying basis for the stipulated permanent injunction no longer exists.

Although an order denying a renewed motion under section 1008, subdivision (b) is not appealable, we exercise our discretion to treat appellants' appeal as a petition for

---

[1] We collectively refer to Le and WCA as "appellants." We refer to Le and WCA separately as needed for clarity.

[2] Unspecified statutory references are to the Code of Civil Procedure.

writ of mandate and deny the constructive petition. The trial court reasonably concluded that appellants did not meet the requirements of section 533. Thus, the trial court did not abuse its discretion when it denied appellants' renewed motion.

## BACKGROUND

1. *Le's Employment with Global Protein Products and
   The Stipulated Permanent Injunction*

Global Protein Products is a protein-based coating company that claims as a trade secret a proprietary formula and process for treating field-cored iceberg lettuce. GPP's trade secret product, when applied to lettuce, prolongs shelf life by preventing dehydration, browning, and pinking of the lettuce's cut surface.

Le, a scientist, was employed by GPP from 2000 to 2003. According to facts later stipulated to by Le, during Le's employment, GPP disclosed to Le the proprietary formula for its trade secret product and the identity of an organic acid used in the product. Le signed a confidentiality agreement with GPP that required him to withhold GPP's confidential information.

Le formed WCA after he left GPP. After he formed WCA, Le and WCA competed with GPP and attempted to sell WCA's products to GPP's customers.

On June 28, 2005, GPP filed a lawsuit against appellants alleging causes of action for trade secret misappropriation, breach of contract, and unfair competition.

GPP requested a temporary restraining order and a preliminary injunction against appellants. Mark Kierstead, GPP's president and founder, prepared a declaration in support of GPP's request. According to Kierstead, an inventor invented a process and formula for making a zein film in pure water in 1993. A patent was issued for this invention in 1997 (the 880 patent), which GPP subsequently acquired.[3] Thereafter, GPP

---

[3] According to appellants, "ICEIN" is the commercial name for the product patented in the 880 patent.

2

began researching whether its patented process for making zein film in pure water could be used on fresh produce. GPP's head scientist discovered that a particular organic acid, if used with the 880 patent, could extend the shelf life of lettuce for seven days. Kierstead declared that GPP never disclosed the identity of this organic acid, and GPP did not patent the combined use of the unnamed organic acid in conjunction with the 880 patent. Instead, GPP treated the unidentified organic acid, used in conjunction with the 880 patent, as a trade secret. Kierstead asserted that in 2005, he received a call from Dole Fresh, one of GPP's customers. A Dole Fresh employee told Kierstead that he had received e-mails from appellants promoting a new product that Le had purportedly developed. In a subsequent e-mail exchange between the Dole Fresh employee and Le, Le sent a "Material Safety Data Sheet" that included the undisclosed organic acid used in GPP's trade secret. Le said that his product used the same organic acid used in GPP's trade secret.

On June 27, 2005, the trial court granted GPP a temporary restraining order against appellants. The temporary restraining order enjoined appellants from acquiring, disclosing, using, or attempting or threatening to acquire, disclose, or use GPP's trade secret, and from directly or indirectly soliciting GPP's customers using GPP's trade secret. On July 18, 2005, the trial court granted GPP a preliminary injunction, enjoining appellants from engaging in these same acts.

On January 11, 2006, GPP and appellants agreed to a stipulated permanent injunction that would "fully and finally resolve all existing and potential differences between them" arising from appellants' use of GPP's trade secret. The parties stipulated that "GPP claim[ed] as a trade secret a proprietary formula and process for treating field cored iceberg lettuce to increase shelf life of the lettuce ('GPP's Trade Secret product')." The parties further stipulated that "[t]he formulation of GPP's Trade Secret product and

3

the identity of the organic acid used in the formulation and process were disclosed to Mr. Le during his employment at GPP."

Pursuant to the stipulated permanent injunction, appellants were permanently enjoined from: (1) "Acquiring, disclosing, using, or attempting or threatening to acquire, disclose, or use, GPP's Trade Secret product, including any information relating to its formulation and process and the identity of the organic acid used in said product," (2) "Directly or indirectly soliciting any of GPP's customers using GPP's Trade Secret product and/or any information related thereto," and (3) "Doing any other act using GPP's Trade Secret or any other information subject to Mr. Le's Confidentiality Agreement with GPP in order to compete with GPP."

2. *GPP's Ex Parte Application for Order to Show Cause Regarding Contempt, VPS's Complaint in Intervention, and Subsequent Proceedings*

In October 2013, Bob Cyr, GPP's chief executive officer (CEO), met with representatives of Inn Foods, Inc., and its parent company, intervenor and respondent VPS Companies, Inc. (VPS), to discuss GPP's shelf life extender products. At the time, VPS notified Cyr that it was subject to legal restrictions due to a settlement from a prior lawsuit with appellants. VPS was not permitted to use shelf life extenders provided by Le and was restricted from engaging in development of shelf life extenders.

After learning this information, GPP conducted its own investigation. Based on its investigation, GPP believed that Le had attempted to sell VPS a trade secret formula that he had created called "WCA Blend T6." GPP believed that the trade secret formula that Le created and sold was derived from GPP's trade secret. According to statements made by Le in his prior litigation with VPS, Le began consulting with Inn Foods in 2005 and began an employment relationship with VPS in 2007. Le previously stated in the prior VPS litigation that " '[o]n July 31, 2012, Defendant MID-CON AG, LLC purchase[d] all ownership rights, title, and interest to the proprietary polysaccharide formulations

4

developed by LE/WCA.' " Thus, GPP claimed that appellants had violated the permanent injunction previously issued by the trial court.

On July 29, 2014, GPP filed an ex parte application for an order to show cause regarding contempt. That same day, the trial court issued an order to show cause to appellants.

On October 30, 2014, the trial court granted VPS's motion to intervene, and VPS filed a complaint in intervention. VPS's complaint in intervention alleged that Le misappropriated GPP's shelf life extenders and falsely claimed to be the owner or inventor of the shelf life extenders that he had provided to VPS. VPS sold products to Kidco Farms Processing until Le's resignation. After Le's resignation, Kidco stopped purchasing products from VPS and began purchasing products from appellants. VPS sued appellants, Kidco, and Mid-Con Ag, LLC. Subsequently, VPS entered into a settlement in that case relying on appellants' purportedly false statements that they, not GPP, had developed the shelf life extender at issue.

Appellants opposed the order to show cause, filed an opposition, and engaged in discovery. Appellants also demurred to VPS's complaint in intervention, moved to compel GPP to identify its trade secrets, and moved for a protective order preventing GPP from conducting discovery until it had identified its trade secrets. GPP later filed an amended disclosure of its trade secret products, which appellants argued was deficient.

On February 26, 2015, the trial court overruled appellants' demurrer to VPS's complaint in intervention. The trial court denied appellants' motion to compel a trade secret designation and for a protective order after determining that GPP's alleged trade secrets were described with reasonable particularity in their amended trade secret designation as required under section 2019.210.[4]

_____

[4] One of the categories identified in GPP's amended trade secret designation was the proprietary formulations of its shelf-life extenders for "P100-Fresh Cut Potatoes,"
(continued)

### 3. *Motion to Modify or Dissolve the Stipulated Permanent Injunction*

Appellants continued to engage in discovery and sent GPP requests for admissions. In their sixth request for admission, appellants asked GPP to admit that the organic acid identified in the first paragraph of the stipulated permanent injunction was citric acid, which GPP admitted. In their seventh request, appellants asked GPP to admit that the organic acid identified in the first paragraph of the stipulated permanent injunction was sodium benzoate, which GPP denied. GPP's answers were both subject to objections that the requests were improper in form and were not full and complete in and of itself.

On July 20, 2016, appellants filed a motion to modify or dissolve the stipulated permanent injunction under section 533. Appellants argued that newly discovered facts—that citric acid was the previously undisclosed organic acid in the stipulated permanent injunction—demonstrated that GPP's trade secret did not possess a commercial advantage, and GPP's trade secret was previously publicly disclosed in a patent (the 880 patent). Appellants further argued that the stipulated permanent injunction's language was overly broad and failed to provide appellants adequate notice of the specific actions that were enjoined. Appellants also claimed that citric acid was widely used for food preservation.

Appellants argued that GPP itself could not define its own trade secret. Appellants' motion quoted excerpts taken from depositions taken of GPP employees. In one quote, Cyr stated that Kierstead would know the identity of the trade secret.[5] In another quote, Kierstead stated that the trade secret was " 'the formula' " as well as the

"Clean and Core" and "P200" ("Subject Shelf-Life Extenders"). The second category was GPP's pricing for its "Subject Shelf-Life extenders," and the third and fourth categories identified by GPP included GPP's proprietary formulas and ingredients for the proprietary formulas.

[5] Appellants' motion states that Kierstead was also GPP's former CEO.

6

" 'organic acid that Tony Jabar figured out.' " Jabar, however, was quoted as saying, " 'I don't know what an undisclosed acid is. So I don't have any way of knowing.' "

GPP opposed the motion to modify or dissolve the stipulated permanent injunction. GPP maintained that it had not disclosed the organic acid used in its trade secret product and had continued to take reasonable steps to protect its proprietary formula. GPP argued that the stipulated permanent injunction's language was purposefully vague to maintain GPP's trade secret, and appellants had previously conceded that they knew the formula for GPP's trade secret and was thus aware of what they were enjoined from using. VPS also opposed appellants' motion.

On August 1, 2016, GPP moved to amend its responses to appellants' first set of requests for admissions. GPP sought to amend its response to the sixth request for admission (whether the undisclosed organic acid was citric acid) to denied, and its response to the seventh request for admission (whether the undisclosed organic acid was sodium benzoate) to the information is protected by trade secret privilege. Both answers were subject to GPP's objection that the requests were improper in form and were not full and complete in and of itself.

In its motion, GPP argued that it had mistakenly admitted that citric acid was the unidentified organic acid in its trade secret. GPP explained that the mistake occurred because citric acid was *one* of the organic acids used in GPP's trade secret; however, it was not the *unidentified* organic acid used in GPP's trade secret. GPP argued that an amendment should be permitted because appellants would not be prejudiced since they already knew the identity of the unidentified organic acid.

Appellants opposed GPP's motion to amend its admissions, but the trial court later granted GPP's request.

7

On September 27, 2016, the trial court denied the motion to dissolve the stipulated permanent injunction after finding that appellants failed to make the showing required under section 533.

4. *The Renewed Motion to Modify or Dissolve the Stipulated Permanent Injunction*

On December 29, 2016, appellants filed a renewed motion to modify or dissolve the stipulated permanent injunction under section 1008, subdivision (b). According to appellants' motion, GPP had served its amended responses to appellants' request for admissions on October 28, 2016. Appellants argued that GPP's amended responses represented new facts that materially altered the circumstances surrounding the prior motion to dissolve the stipulated permanent injunction. Specifically, when GPP filed its amended response to appellants' request for admissions, instead of filing an amended response in accordance with its motion to amend its admissions, GPP admitted that the organic acid identified in the first paragraph of the stipulated permanent injunction was sodium benzoate. According to appellants, sodium benzoate was well-known and extensively used in the food preservation industry, and GPP itself disclosed its use of sodium benzoate in a prior patent (again, the 880 patent) and a prior patent application (the 147 patent application).

Appellants attached copies of the 880 patent and the 147 patent application to its motion. The 880 patent, titled "Protein-Polysaccharide Complex Composition and Method of Use," summarized its invention as follows: "Food products are preserved or stabilized against deterioration of organoleptic properties during storage by contacting the food products with an aqueous solution of a stabilizing composition containing at least one stabilizing acid and a protein-polysaccharide complex composition including at least one water-soluble polysaccharide and at least one substantially water-insoluble protein."

The 880 patent described several examples of how to prepare the protein-polysaccharide complex (PPC) composition referenced in the patent, with some

8

examples going into great detail about the proposed methods of preparation for seafood. The 880 patent's first claim stated that "[w]hat is claimed is: [¶] 1. A food preserving composition for treating edible products to maintain or refurbish desirable organoleptic qualities thereof comprising: a mixture of at least one stabilizing acid and a [PPC] composition comprising: [¶] between about 90% to 99.5% by weight of a water soluble -polysaccharide impregnated with between about 10% to 0.5% by weight of a substantially water-insoluble protein." The 880 patent further described as its eleventh claim: "The food preserving composition of claim 1 wherein the stabilizing acid is an organic food grade acid or a salt thereof."

The 147 patent application, titled "Method of Increasing Crop Yield," stated that the invention could be used "to enhance the germination, emergence, root mass development, disease resistance, photosynthetic rate, plant growth, and crop yield of a variety of agricultural commodities including but not limited to . . . lettuce . . . ." The 147 patent application noted that "additives may be added to the aqueous alcohol solution to promote stability of the peptide-polysaccharide complex," and further stated that additives could include "anti-microbial compounds such as . . . benzoic acid."

The 147 patent application was filed in 2002, before the parties agreed to the stipulated permanent injunction. The 880 patent was issued in 1997, also before the parties agreed to the stipulated permanent injunction. Thus, appellants claimed that GPP's prior disclosure of sodium benzoate demonstrated that GPP had no commercial advantage in its trade secret because business competitors could readily ascertain all of the components necessary to recreate GPP's trade secret.

In support of their renewed motion, appellants filed a declaration prepared by Irving Rappaport, a patent attorney retained by appellants to render an opinion about GPP's trade secret. Rappaport stated that he believed that GPP had not articulated a sufficiently clear and unambiguous statement of its trade secret, and GPP had not

9

identified and maintained the secrecy of its trade secret. Rappaport further stated that in his opinion, the combination of the 880 patent, the 147 patent application, and several articles discussing the use of sodium benzoate for preserving lettuce demonstrated that GPP's trade secret had never been a trade secret.

GPP opposed appellants' renewed motion to modify or dissolve the stipulated permanent injunction. In part, GPP argued that appellants failed to show a material change in the facts upon which the stipulated permanent injunction was issued. GPP disputed appellants' claim that its trade secret was not a secret. GPP argued that "a trade secret can also be a formula, a process, a method or technique." VPS also opposed appellants' motion, arguing that appellants did not demonstrate new facts to support dissolving the injunction under section 533.

On January 31, 2017, the trial court denied appellants' renewed motion to modify or dissolve the stipulated permanent injunction, finding that the motion did not meet the requirements of section 1008, subdivision (b) and section 533. On February 10, 2017, appellants filed a notice of appeal specifying that the appeal was taken from the trial court's order denying appellants' renewed motion.

## DISCUSSION

Appellants did not appeal from the trial court's order denying their first motion to modify or dissolve the stipulated permanent injunction. Instead, appellants appeal from the trial court's order denying their *renewed* motion filed pursuant to section 1008, subdivision (b). Although we conclude that an order denying a renewed motion pursuant to section 1008, subdivision (b) is not appealable, we treat appellants' appeal as a petition for a writ of mandate and address their claims. Based on our review, we conclude that the trial court did not abuse its discretion when it denied the renewed motion to dissolve the stipulated permanent injunction.

10

1. *Appealability*

### a. Section 1008

Section 1008 describes applications for reconsiderations of court orders (§ 1008, subd. (a)) and renewals of previous motions (§ 1008, subd. (b)).

Section 1008, subdivision (a) states in pertinent part: "When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order."

Likewise, section 1008, subdivision (b) states in pertinent part: "A party who originally made an application for an order which was refused in whole or part, or granted conditionally or on terms, may make a subsequent application for the same order upon new or different facts, circumstances, or law, in which case it shall be shown by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown."

Section 1008, subdivision (g) specifies that "[a]n order denying a motion for reconsideration made pursuant to subdivision (a) is not separately appealable. However, if the order that was the subject of a motion for reconsideration is appealable, the denial of the motion for reconsideration is reviewable as part of an appeal from that order."

### b. Appealability of Orders Denying Renewed Motions

GPP argues that orders denying renewed motions under section 1008, subdivision (b) are not appealable. Appellants claim that there is a "split in authority" over the appealability of a renewed motion under section 1008, subdivision (b), and this court should find that the order denying the renewed motion is appealable.

11

Appellants' assertion that there is a split in authority over the appealability of orders denying renewed motions under section 1008, subdivision (b) is misleading. In their reply brief, appellants cite to no cases that hold that orders denying renewed motions are appealable, and we have found no cases that support appellants' position. In contrast, two appellate cases, *Tate v. Wilburn* (2010) 184 Cal.App.4th 150 (*Tate*) and *Chango Coffee, Inc. v. Applied Underwriters, Inc.* (2017) 11 Cal.App.5th 1247 (*Chango*), have concluded that orders denying renewed motions under section 1008, subdivision (b) are not appealable. We find *Tate* and *Chango* persuasive.

In *Tate*, the defendant filed an order to show cause seeking to set aside a child support order. (*Tate*, *supra*, 184 Cal.App.4th at p. 153.) The motion was denied in August 2008, and the defendant filed a renewed motion under section 1008, subdivision (b) in October 2008. (*Tate*, *supra*, at p. 154.) The defendant attached new evidence with his renewed motion that demonstrated that he was not the father of the child who was the subject of the support order. (*Id*. at pp. 154-155.) The trial court denied the renewed motion, and the defendant appealed. (*Id*. at pp. 152, 155.)

On appeal, *Tate* first examined the appealability of motions for reconsideration made under section 1008, subdivision (a). (*Tate*, *supra*, 184 Cal.App.4th at pp. 158-159.) At the time *Tate* was decided, section 1008, subdivision (g) was not yet enacted, and there was a split of authority concerning the appealability of orders denying section 1008, subdivision (a) motions, with the majority of recent cases holding that motions for reconsideration were not appealable. (*Tate*, *supra*, at pp. 158-159.) *Tate* observed that motions for reconsideration under section 1008, subdivision (a) and renewed motions under section 1008, subdivision (b) were closely related. (*Tate*, *supra*, at pp. 159-160.) *Tate* then applied the same analysis that courts had previously applied to find orders denying motions under section 1008, subdivision (a) nonappealable to orders denying motions under section 1008, subdivision (b). (*Tate*, *supra*, at p. 160.)

12

Thus, *Tate* held that orders denying renewed motions under section 1008, subdivision (b) were not appealable because such a determination would eliminate the possibility that "(1) a nonappealable order or judgment would be made appealable, (2) a party would have two appeals from the same decision, and (3) a party would obtain an unwarranted extension of time to appeal." (*Tate*, *supra*, 184 Cal.App.4th at p. 160.)

After *Tate* was decided, the Legislature amended section 1008 and added section 1008, subdivision (g). (Stats. 2011, ch. 78, § 1.) As amended, section 1008, subdivision (g) expressly states that orders denying motions for reconsideration under section 1008, subdivision (a) are not separately appealable. The statute, however, is silent as to whether orders denying renewed motions under section 1008, subdivision (b) are appealable.

In *Chango*, the appellate court considered the argument that *Tate* was abrogated by the Legislature's subsequent amendment to section 1008. (*Chango*, *supra*, 11 Cal.App.5th at p. 1253.) The respondents in *Chango* argued that because the amendment to section 1008 did not likewise provide that renewed motions under section 1008, subdivision (b) are not separately appealable, *Tate* was effectively abrogated. (*Chango*, *supra*, at p. 1253.) *Chango* disagreed, observing that the Legislature is presumed to know of existing judicial decisions when enacting or amending legislation. (*Ibid*.) Thus, "the Legislature's decision not to address the appealability of orders denying renewed motions under section 1008, subdivision (b) suggests the Legislature intended the *Tate* court's construction to control." (*Ibid*.)

Appellants argue that *Tate* was wrongly decided and rested on the erroneous assumption that the differences between subdivisions (a) and (b) of section 1008 were minor and cosmetic. Appellants characterize reconsideration motions under section 1008, subdivision (a) as a vehicle for trial courts to engage in error-correction and insist

13

that these motions have a broader reach and are more powerful than renewed motions under section 1008, subdivision (b).

Appellants misread section 1008, subdivisions (a) and (b). As stated in *Tate*, "[a] party filing either a motion under section 1008, subdivision (a) or (b) is seeking a new result in the trial court based upon 'new or different facts, circumstances, or law.' (§ 1008, subds. (a), (b).)" (*Tate*, *supra*, 184 Cal.App.4th at p. 160.) A motion for reconsideration under section 1008, subdivision (a) is not focused on error-correction. Like a renewed motion, it asks the trial court to reconsider its earlier ruling either based on additional evidence or new law. As a result, we agree with *Tate* and *Chango* and conclude that order denying appellants' renewed motion under section 1008, subdivision (b) was not appealable.

VPS agrees with GPP's argument that the order denying the renewed motion under section 1008, subdivision (b) is not appealable but argues that this court should exercise its discretion and consider the case on the merits. As GPP acknowledges in its respondent's brief, *Tate* explained that there may be instances where "a party is unable to obtain appellate review of a ruling in a significant proceeding in which newly discovered evidence was presented" because renewed motions under section 1008, subdivision (b) are not appealable. (*Tate*, *supra*, 184 Cal.App.4th at p. 161, fn. 10.) In these instances, a party may file a petition for writ of mandate seeking extraordinary relief. (*Ibid.*)

We requested supplemental briefing from the parties, asking if this court should exercise its discretion to consider appellants' appeal as a petition for a writ of mandate, which we must do only "under unusual circumstances." (*Olson v. Cory* (1983) 35 Cal.3d 390, 401 (*Olson*).) In response, all of the parties urge us to consider the appeal as a petition for writ of mandate.

The California Supreme Court in *Olson* determined that it was appropriate to treat an appeal as a petition for a writ of mandate when there was no adequate remedy at law,

14

"the issue of appealability was far from clear in advance," the records and briefs included the necessary elements for a petition for a writ of mandate, there was nothing to indicate that the trial court would appear separately or become more than a nominal party, and dismissing the appeal rather than exercising the court's discretion to reach the merits would be " ' "unnecessarily dilatory and circuitous." ' " (*Olson*, *supra*, 35 Cal.3d at p. 401.)

Not all of the elements articulated in *Olson* are present here. In particular, this is not a case where the issue of appealability was far from clear in advance. The only published cases on the issue, *Tate* and *Chango*, have both held that renewed motions under section 1008, subdivision (b) are not appealable. (*Tate*, *supra*, 184 Cal.App.4th at p. 160; *Chango*, *supra*, 11 Cal.App.5th at p. 1254.)

This case, however, presents a relatively unusual procedural situation because it is unclear when or if appellants will be able to challenge the trial court's ruling from a later appealable order or judgment. Although a contempt proceeding is ongoing below, a judgment of contempt is not appealable. (§§ 904.1, subd. (a)(1), 1222.) Additionally, the merits of the issues raised by appellants have been fully briefed by all parties, there is no indication that the trial court would appear separately or become more than a nominal party, and failing to reach the merits of the issues raised would be unnecessarily circuitous as similar issues may recur as the stipulated permanent injunction remains in force. As a result, we exercise our discretion and treat appellants' appeal as a petition for a writ of mandate.[6]

---

[6] We also observe that an order denying a motion to dissolve or modify an injunction under section 533 is appealable. (§ 904.1, subd. (a)(6).) We see no reason why appellants would have been barred from filing a second motion under section 533. Instead, appellants chose to frame the motion as a renewed motion under section 1008, subdivision (b). Had appellants filed a successive motion under section 533, the trial court's denial of that motion would have been appealable.

2. *The Renewed Motion Failed on Its Merits*

When it denied appellants' renewed motion, the trial court determined that the renewed motion failed to satisfy both sections 1008, subdivision (b) and 533. On appeal, appellants argue that the trial court erred because their renewed motion met the requirements of *both* sections 1008, subdivision (b) and 533.

As we explain, we conclude that the trial court did not err when it determined that appellants' motion did not satisfy section 533.[7] As a result, the trial court did not err when it denied appellants' motion.

a. **General Legal Principles and Standard of Review**

Section 533 provides that "[i]n any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order."

Civil Code section 3426.2, subdivision (a) provides that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from misappropriation."

We review the trial court's order denying a motion to dissolve an injunction for an abuse of discretion. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505; *People ex rel. Feuer v. Progressive Horizon, Inc.* (2016) 248 Cal.App.4th 533, 540.) The trial

---

[7] Since we conclude that the trial court did not err when it determined that the renewed motion did not meet the requirements of section 533, we do not need to reach the trial court's alternate ground for denying the motion—that the requirements of section 1008, subdivision (b) were not met.

court's decision not to dissolve a permanent injunction " ' " 'rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case.' " ' " (*People v. Brewer* (2015) 235 Cal.App.4th 122, 136.)  Here, appellants strenuously dispute whether GPP's trade secret was a trade secret.  "The issue of whether information constitutes a trade secret is a question of fact." (*Thompson v. Impaxx*, *Inc*. (2003) 113 Cal.App.4th 1425, 1430.)  To the extent we review the trial court's factual findings, we apply the substantial evidence standard of review.  (*Loeffler*, *supra*, at p. 1505.)  In general, "[w]e presume that the trial court[’s] order is correct, and imply findings that are necessary to support the judgment."  (*Estate of O'Connor* (2017) 16 Cal.App.5th 159, 169.)

b.  **Existence of a Valid Trade Secret**

Appellants argue that the stipulated permanent injunction was based on trade secret law, and, as a result, the injunction must be based on a valid trade secret.  Thus, appellants insist that the injunction should have been dissolved because the renewed motion demonstrated that a valid trade secret no longer existed.  Appellants argue that under section 533, there was a material change in the facts upon which the stipulated permanent injunction was granted.  Appellants claim that appellants' prior disclosures of its unidentified organic acid—such as in the 880 patent cited in their renewed motion— vitiated GPP's commercial advantage because a technical person versed in food preservation practices could easily reverse engineer GPP's trade secret.

The Uniform Trade Secret Act defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  (Civ. Code, § 3426.1, subd. (d).)

17

We agree with appellants that publication of a trade secret destroys it. Federal cases that have applied California law have consistently concluded that once a trade secret is publicly disclosed in a patent, the information contained in the trade secret is placed in the public domain and the trade secret is subsequently extinguished. (*Forcier v. Microsoft Corp.* (N.D.Cal. 2000) 123 F.Supp.2d 520, 528; *Stutz Motor Car of America v. Reebok Intern., Ltd.* (C.D.Cal. 1995) 909 F.Supp. 1353, 1359.) Likewise, California courts have also concluded that widespread publication of a purported trade secret extinguishes the trade secret. (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 251 [widespread publication of information over Internet may destroy trade secret].)

As the trial court did not make any express findings on the record, we must imply findings necessary to support its order. (*Estate of O'Connor*, *supra*, 16 Cal.App.5th at p. 169.) Here, the trial court could have reasonably concluded that the publication of the 880 patent and the 147 patent application, combined with the identification of sodium benzoate as the stipulated permanent injunction's previously undisclosed organic acid, did not destroy GPP's trade secret. In the stipulated permanent injunction, the parties agreed that "GPP claim[ed] as a trade secret a proprietary formula and process for treating field cored iceberg lettuce to increase shelf life of the lettuce ('GPP's Trade Secret product')." In other words, GPP's trade secret was not limited to the identity of the components used; the trade secret encompassed the proprietary formula and the *process* for treating lettuce.

There is sufficient evidence to support the trial court's implied determination that GPP has a valid trade secret. Appellants observe that the 880 patent, which describes the process for making PPC compositions, states as its first claim the invention of "[a] food preserving composition for treating edible products . . . comprising a mixture of at least one stabilizing acid." Later, the 880 patent states as another claim, "[t]he food preserving

18

composition of claim 1 wherein the stabilizing acid is an organic food grade acid or a salt thereof." However, disclosure of sodium benzoate as the "organic food grade acid" contemplated by the 880 patent does not, by itself, reveal the process that GPP's trade secret product is applied and used on lettuce. Likewise, the 880 patent describes the process to create a generic PPC composition but *also* specifically describes detailed examples of how to prepare different iterations of PPC compositions to be used on seafood. Appellants, however, do not articulate *which* preparation discloses GPP's trade secret.[8] Appellants merely vaguely reiterate that GPP's trade secret is the combination of sodium benzoate with the 880 patent.

Appellants further claim that the 147 patent application discloses the use of sodium benzoate to preserve lettuce, destroying GPP's commercial advantage. Appellants, however, do not cite to anything in the record that demonstrates that the 147 patent application actually discloses GPP's trade secret. In fact, it appears that the 147 patent application merely makes a passing reference to the preservation of lettuce using "anti-microbial compounds" such as "benzoic acid," a term that appellants claim is synonymous with sodium benzoate. Based on its title, "Methods of Increasing Crop Yield," the 147 patent application does not contemplate the invention of a product that extends shelf life. The 147 patent application states that the invention is meant "to

---

[8] One example of how to prepare a PPC composition is described in the 880 patent as follows: "Fifty grams (50 g) of citric acid was added to 0.675 kg of water used to prepare 4.5 kg of an 85:15 alcohol: water aqueous organic solvent system. Five hundred grams of zein was added to the aqueous organic solvent system in a suitable vessel. The aqueous organic solvent was kept in motion during the addition with the aid of a mechanical stirrer. Accordingly, a solution of 10% by weight of zein in aqueous alcohol was prepared. [¶] Nine and one-half kg of guar gum was added to the 10% zein solution with mixing in a Stokes Heavy Duty sigma-type blender. After about 30 minutes of continuous mixing, the mass was homogenous, slightly tan, and had a wet, sand-like consistency. The mass was dried in an explosion-proof drier to yield a protein-polysaccharide complex."

enhance the germination, emergence, root mass development, disease resistance, photosynthetic rate, plant growth, and crop yield of a variety of agricultural commodities including but not limited to . . . lettuce . . . ." Appellants do not cite to a particular portion of the 147 patent application that expressly discusses extending the shelf life of cut lettuce, and there is nothing in the record that demonstrates that this specific process is public information or has been otherwise published.

For these reasons, appellants' claim that the trial court abused its discretion when it did not dissolve the stipulated permanent injunction under section 533 and Civil Code section 3426.2 is without merit.

c. **Vagueness and Enforceability of the Stipulated Permanent Injunction**

Appellants argue that the stipulated permanent injunction fails to adequately provide a standard of conduct because its terms are too vague. Appellants further argue that the trial court lacked authority over the injunction because it would be precluded from finding appellants in contempt under Civil Code section 3426.2. Thus, appellants argue that "the ends of justice would be served" (§ 533) by dissolving the stipulated permanent injunction.

Appellants, however, *agreed* to the terms of the stipulated permanent injunction that they now claim are too vague to be enforced. Appellants did not seek relief from their stipulations, and to the extent appellants challenge issues that could have been raised in a prior appeal—such as an appeal from the permanent injunction itself—those issues are not now reviewable here. (See *Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1085 [issues that could have been raised in appeal from original restraining order could not be raised on appeal from order refusing to dissolve the restraining order]; *Harris v. Spinali Auto Sales, Inc.* (1966) 240 Cal.App.2d 447, 452-454 [party remains bound to stipulation unless relief is obtained by trial court].)

20

Appellants claim that recently discovered evidence underscores the vagueness of the permanent injunction, citing to the deposition testimony of various GPP employees including Cyr, Jabar, and Kierstead. Appellants further argue that GPP's own amended trade secret designation reflects that GPP cannot articulate how its trade secret is used on lettuce and fails to list information that was not already publicly available.

The trial court, however, could have reasonably concluded that the language of the stipulated permanent injunction was sufficiently definite, despite appellants' contrary evidence. (See § 2019.210 [in any action alleging a misappropriation of a trade secret, the party alleging the misappropriation must identify the trade secret with reasonable particularity]; *Altavion*, *Inc*. *v*. *Konica Minolta Systems Laboratory*, *Inc*. (2014) 226 Cal.App.4th 26, 43-44 ["the trade secret must be described 'with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies' "]; *Perlan Therapeutics*, *Inc*. *v*. *Superior Court* (2009) 178 Cal.App.4th 1333, 1349 [trial court "must exercise its sound discretion in determining how much disclosure is necessary to comply with section 2019.210 under the circumstances of the case"].) As we previously observed, the parties stipulated that that "GPP claim[ed] as a trade secret a proprietary formula and process for treating field cored iceberg lettuce to increase shelf life of the lettuce ('GPP's Trade Secret product')." The stipulated permanent injunction did not identify the precise formula or ingredients used in GPP's trade secret, but its failure to do so did not mean that GPP's description of its trade secret was not sufficiently clear. (See *Advanced Modular Sputtering*, *Inc*. *v*. *Superior Court* (2005) 132 Cal.App.4th 826, 835 [§ 2019.210 does not require that a party alleging misappropriation must "define every minute detail of its claimed trade secret"].)

21

Finally, appellants insist that the ends of justice would be served by dissolving the stipulated permanent injunction because the injunction was void and entered in excess of the trial court's jurisdiction; thus, the trial court would be precluded from finding appellants in contempt of the injunction.

Appellants primarily rely on *Loftis v. Superior Court* (1938) 25 Cal.App.2d 346. There, the appellate court determined that the trial court acted in excess of its jurisdiction when it entered an injunction restraining certain public officers from duties required of them by existing, valid state law. (*Id.* at pp. 353-354.) *Loftis* determined that the provisions of Civil Code section 3423, which provided in part that an injunction cannot be granted " '[t]o prevent the execution of a public statute by officers of the law for the public benefit' " (*Loftis*, *supra*, at p. 352), was a limitation on the exercise of the trial court's jurisdiction. Here, appellants argue that like the injunction contemplated in *Loftis*, the stipulated permanent injunction in this case was entered in excess of the trial court's jurisdiction because it contravened Civil Code section 3426.2, which requires the termination of injunctions when a trade secret no longer exists.

In contrast, both GPP and VPS argue that *Wanke*, *Industrial*, *Commercial*, *Residential*, *Inc*. *v*. *Keck* (2012) 209 Cal.App.4th 1151 is squarely applicable to this case and precludes appellants from arguing that the stipulated permanent injunction cannot be enforced. In *Wanke*, the Fourth Appellate District held that "a party may successfully defend against the enforcement of an injunction on the ground that the injunction is invalid only in the narrow circumstance in which the party can demonstrate that the injunction was beyond the trial court's jurisdiction to issue in the first instance." (*Id.* at p. 1177.) In its decision, *Wanke* distinguished between injunctions issued in excess of a court's jurisdiction and injunctions that are legally erroneous and therefore void. Citing *In re Berry* (1968) 68 Cal.2d 137 and *Signal Oil & Gas Co*. *v*. *Ashland Oil & Refining Co*. (1958) 49 Cal.2d 764, *Wanke* observed that an order does not suffer from

22

jurisdictional defects if the invalidity of the agreement does not appear upon the face of the order and if the order was issued based on an error of law of less than constitutional stature. (*Wanke*, *supra*, at pp. 1173-1174; *Berry*, *supra*, at p. 148; *Signal Oil*, *supra*, at p. 776.)

GPP and VPS both insist that under *Wanke*, the stipulated permanent injunction was not issued in excess of the trial court's jurisdiction. Thus, GPP and VPS claim that appellants cannot defend against the trial court's enforcement of the injunction as described in *Wanke*. The issue contemplated in *Wanke*, however, is not completely analogous to the issues argued by appellants in the present action. Here, appellants argue that the injunction should be *dissolved* under section 533 and Civil Code section 3426.2, in part because there is no valid trade secret to protect. Nothing in *Wanke* suggests that a legally erroneous injunction cannot be dissolved if the trial court determines that the requirements of section 533 have been met.

Ultimately, we do not need to decide whether the stipulated permanent injunction was entered in excess of the trial court's jurisdiction as contemplated in *Loftis* or whether appellants cannot defend against the enforcement of the injunction as described in *Wanke*. As we have explained, appellants' claim that the stipulated permanent injunction is unenforceable and should be terminated under Civil Code section 3426.2 is premised on their assertion that GPP has no valid trade secret. Based on our conclusion that sufficient evidence supports the trial court's implied determination that GPP has a valid trade secret, appellants' argument that the stipulated permanent injunction is unenforceable and void under Civil Code section 3426.2 is without merit.

d. **Conclusion**

We find that the trial court did not abuse its discretion when it concluded that appellants did not meet the requirements of section 533. Likewise, the trial court did not

23

abuse its discretion by determining that it was not required to terminate the stipulated permanent injunction under Civil Code section 3426.2, subdivision (a).

## DISPOSITION

The constructive petition for writ of mandate is denied. Respondent and intervenor are entitled to their costs.

_____

Premo, J.

WE CONCUR:

_____

Greenwood, P.J.

_____

Elia, J.

Global Protein Products, Inc. v. Le et al.
H044628

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 105CV043903 |
|---|---|
| Trial Judge: | Hon. William J. Elfving |
| Counsel for Plaintiff/Respondent:<br>Global Protein Products, Inc. | Berding & Weil<br>Paul Wilfred Windust |
| Counsel for Defendants/Respondents:<br>Kevin Le<br>West Coast AG | Berstein Law<br>David Alan Berstein<br>John Dimuzio Jr. |
| Counsel for Interveners/Respondents:<br>The VPS Companies, Inc.<br>Inn Foods, Inc. | Johnson & James<br>Robert K. Johnson |

Global Protein Products, Inc. v. Le et al.
H044628