[No. S120332. Feb. 14, 2005.]

HLC PROPERTIES, LIMITED, et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MCA RECORDS, INC., et al., Real Parties in Interest.

56

COUNSEL

Law Offices of Mark A. Brodka, Mark A. Brodka; Girardi and Keese, Thomas V. Girardi, Howard B. Miller and Shahram S. Shayesteh for Petitioner.

No appearance for Respondent.

Irell & Manella, Gregory R. Smith, Steven A. Marenberg, Steve Kang, Elizabeth L. Rosenblatt and Philip M. Kelly for Real Parties in Interest.

## OPINION

**BAXTER, J.**—At issue in this matter are 59 written communications pertaining to three recording contracts executed by the late Harry Lillis Crosby, the talented entertainer known to all as Bing Crosby. In the proceedings below, the trial court rejected plaintiffs' claim of attorney-client privilege with respect to the 59 documents, many of which were either authored or received by persons Crosby had hired to help manage his business interests. We conclude that the trial court ruled correctly and that the Court of Appeal erred in granting plaintiffs' petition for writ of mandate.

### FACTUAL AND PROCEDURAL BACKGROUND

Bing Crosby was one of the most successful entertainers of his time. When he died in 1977, he left an extensive portfolio of interests in records, radio and television productions, motion pictures, and musical and literary works, as well as the contract and publicity rights related to those interests. He also

left business interests he had accumulated in mining, oil, real estate, and other financial ventures. Crosby owned these interests during his lifetime, but he managed them with the assistance of others he employed. One such employee was Basil Grillo (Grillo), an accountant who became Crosby's business manager and worked for him for over 30 years. Crosby and his employees referred to Crosby's various business operations collectively as "Bing Crosby Enterprises" (Enterprises).[1]

After Crosby's death, the executor of his estate (Richard C. Bergen of the law firm of O'Melveny & Meyers) continued to maintain "Mr. Crosby's business office," where Enterprises operated. In 1980, the executor entered into a limited partnership agreement with Hillsborough Productions, Inc., and Kathryn G. Crosby (Crosby's second and surviving spouse) to form HLC Properties, Limited (HLC Properties), an entity that would manage the interests Crosby left. Ultimately, the executor transferred the estate's 78.685 percent interest in certain properties to HLC Properties. Kathryn G. Crosby also transferred her 21.315 percent interest in these same properties to HLC Properties. The properties transferred to HLC Properties include the three recording contracts that are the subject of this litigation. In January 1981, the superior court filed the "Order Settling First and Final Account and Report of Executor, etc.," which approved the formation of HLC Properties, approved the estate's agreement to transfer estate properties and assets to HLC Properties, and approved the estate's transfer of its limited partnership interest in HLC Properties to various family member trusts. Upon final distribution of the estate, the executor was discharged.

In July 2000, HLC Properties and the trustee for the Wilma Wyatt Crosby Trust[2] (collectively HLC) initiated this action against defendants MCA Records, Inc., GRP Records, Inc., UMG Recordings, Inc., MCA, Inc., and Universal Studios, Inc. (collectively MCA), for allegedly underpaying royalties due on three recording contracts between Crosby and MCA's predecessors in interest, dated March 29, 1943, January 3, 1949, and May 10, 1956, respectively.

In the course of pretrial discovery, MCA propounded to HLC a demand for production of documents. In response, HLC produced some documents but withheld others that it listed in a privilege log as containing protected attorney-client communications. MCA later issued a third party deposition subpoena to Crosby's former law firm, O'Melveny & Meyers, for production of documents. O'Melveny & Meyers produced some documents through

---

[1] Not to be confused with Enterprises, a corporation called Bing Crosby Enterprises, Inc., was formed in the 1940's, but was later dissolved or otherwise liquidated in the 1950's.

[2] Wilma Wyatt Crosby, Crosby's first wife, owned a community property interest in any royalty stream from recordings made during their marriage.

HLC's attorney, who also submitted a "supplemental privilege log" that added three documents to HLC's original privilege log.

Thereafter, MCA issued a subpoena duces tecum to HLC for the production at trial of 59 of the documents HLC listed in its privilege logs. Many of the 59 documents reflected written communications between attorneys and persons Crosby had hired, and of those, approximately 48 had been sent when Crosby apparently was conducting an audit of his recording artist royalties in 1959 and 1960. In its motion and trial court briefing on the matter, MCA contended the 59 documents might provide critical support to its interpretation of the royalty provisions in dispute and its position that the contracting parties had previously resolved the accounting matters at issue.

On the first day of trial, the court considered the enforceability of MCA's subpoena duces tecum in view of HLC's attorney-client privilege objections. After hearing counsel's arguments, the court agreed with MCA that Crosby was the client and the holder of the privilege and that the privilege terminated after his death. The court did not recognize Enterprises or HLC as a privilege holder.

The Court of Appeal granted HLC's petition for a writ of mandate in a published opinion. In brief, it found that Enterprises constituted an organization during Crosby's lifetime, and therefore that HLC, as Enterprises' successor, currently holds the privilege. The Court of Appeal remanded the matter to the trial court with instructions to vacate its order compelling compliance with MCA's subpoena duces tecum and to consider each document listed in HLC's privilege logs to determine whether, in accordance with the appellate court's opinion, the attorney-client privilege applied.

We granted MCA's petition for review.

### DISCUSSION

As proposed by the California Law Revision Commission (the Commission) and subsequently enacted by the Legislature in 1965, the Evidence Code[3] declares authoritatively that evidentiary privileges such as the attorney-client privilege are governed by statute. (§ 911; *Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1129 [69 Cal.Rptr.2d 317, 947 P.2d 279].) The party claiming a privilege shoulders the burden of showing that the evidence it seeks to suppress falls within the terms of an applicable statute. (*D.I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729

---

[3] All further statutory references to this code unless otherwise indicated.

[36 Cal.Rptr. 468, 388 P.2d 700] (*Chadbourne*); see also *People v. Gionis* (1995) 9 Cal.4th 1196, 1208 [40 Cal.Rptr.2d 456, 892 P.2d 1199] (*Gionis*).)

■ " 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations].' " (*Gionis*, *supra*, 9 Cal.4th at p. 1208, quoting *Chadbourne*, *supra*, 60 Cal.2d at p. 729.) Accordingly, unless a claimed privilege appears as a matter of law from the undisputed facts, an appellate court may not overturn the trial court's decision to reject that claim. (See *ibid.*)

In the matter before us, HLC relies on section 953, subdivision (d), which defines a holder of the attorney-client privilege to include "[a] successor . . . of a[n] . . . association [or] organization . . . that is no longer in existence." HLC's primary argument, which the Court of Appeal also largely espoused, is that Enterprises was an unincorporated organization; that during Crosby's lifetime, Enterprises was the client and holder of the attorney-client privilege with respect to the 59 withheld documents; and that HLC currently holds the privilege as Enterprises' successor.[4]

Conversely, MCA relies on section 953, subdivision (c), which provides that, "if the client is dead," the holder of the attorney-client privilege is the client's "personal representative." It is MCA's position that Bing Crosby, the natural person, not Enterprises, was the client and holder of the attorney-client privilege with respect to the 59 documents; that the executor of Crosby's estate held the privilege upon Crosby's death; and that the privilege ceased to exist after the estate was finally distributed and the executor discharged.

Resolution of the instant dispute hinges on two questions. First, who may hold the attorney-client privilege initially? Second, who may succeed to the privilege? We address these questions in order.

A. *Who May Hold the Attorney-client Privilege Initially?*

■ With certain exceptions not relevant here, the Evidence Code provides that a "client" has "a privilege to refuse to disclose, and to prevent

---

[4] At times, HLC contends Enterprises was either an "association" or an "organization" as those terms are used in section 953, subdivision (d). As HLC points out, however, Black's Law Dictionary defines an "association" to include "[a]n unincorporated business organization that is not a legal entity separate from the persons who compose it" and defines an "organization" as "a body of persons (such as a union or corporation) formed for a common purpose," thus offering somewhat overlapping definitions for the two terms. (Black's Law Dict. (7th ed. 1999) pp. 119, col. 1 [association], 1126, col. 1 [organization].)

another from disclosing, a confidential communication" the client has had with an attorney "if the privilege is claimed by" someone statutorily authorized to do so. (§ 954.) A " 'client' means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity." (§ 951.) For purposes of the Evidence Code, a " 'person' includes a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity." (§ 175.)

■ As for who may claim the attorney-client privilege, the Evidence Code designates a " 'holder of the privilege' " (§ 954, subd. (a)); a person the privilege holder authorizes to claim the privilege (*id.*, subd. (b)); or the attorney at the time of the confidential communication if the privilege holder is in existence and has not authorized the communication's disclosure (*id.*, subd. (c)). Section 953, in turn, defines a "holder of the privilege" to mean "[t]he client when he has no guardian or conservator" (§ 953, subd. (a)), "[a] guardian or conservator of the client when the client has a guardian or conservator" (*id.*, subd. (b)), "[t]he personal representative of the client if the client is dead" (*id.*, subd. (c)), or "[a] successor, assign, trustee in dissolution, or any similar representative of a firm, association, organization, partnership, business trust, corporation, or public entity that is no longer in existence" (*id.*, subd. (d)). Pursuant to these statutory provisions, an individual, an association, or an organization may qualify as a client, and a living or existing client is the privilege holder initially.

HLC contends that when an unincorporated organization such as Enterprises manages an individual's assets or business interests, and the individual, either personally or through agents, consults an attorney about those assets or business interests, the managing organization holds the privilege. To evaluate this contention, we consider what characteristics, if any, are necessary for an organization to hold the attorney-client privilege.

In the proceedings below, the Court of Appeal reviewed various dictionary definitions of the term "organization," as well as case law addressing the term in other contexts. (E.g., Random House Webster's College Dict. (2000) p. 933 [defining "organization" as "a group of persons organized for some end or work" or "the administrative personnel or apparatus of a business"].) Because the term generally describes a group of persons working to pursue a common purpose, the Court of Appeal concluded that "the business staff assembled by Crosby to operate his entertainment interests qualifies as an organization . . . for purposes of succession to the attorney-client privilege." Similarly, HLC contends here that Crosby developed Enterprises as a business organization by "surround[ing] himself with long-term, loyal employees and attorneys to advise him in conducting his far-reaching business interests."

■ The Evidence Code does not define the term "organization." Neither did the Commission propose a statutory definition of the term for the Legislature's approval. The Commission, however, observed in a comment to the statute defining "client" that "such unincorporated organizations as labor unions, social clubs, and fraternal societies have a lawyer-client privilege when the organization (rather than its individual members) is the client." (Com. com., reprinted at 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 951, p. 207; cf. *Smith v. Laguna Sur Villas Community Assn.* (2000) 79 Cal.App.4th 639, 643 [94 Cal.Rptr.2d 321] [holding that a condominium association was the holder of the attorney-client privilege and that its individual members could not demand production of privileged documents, except as the association's board allowed].) While not binding, the Commission's official comments reflect the intent of the Legislature in enacting the Evidence Code and are entitled to substantial weight in construing it. (*Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 249 [66 Cal.Rptr. 20, 437 P.2d 508], overruled on another point in *Privette v. Superior Court* (1993) 5 Cal.4th 689, 702, fn. 4 [21 Cal.Rptr.2d 72, 854 P.2d 721]; see *People v. Williams* (1976) 16 Cal.3d 663, 667–668 [128 Cal.Rptr. 888, 547 P.2d 1000].)

As MCA points out, each of the three unincorporated organizations the Commission lists is a collective entity that the Internal Revenue Code recognizes as having tax exempt status. (Int. Rev. Code, § 501(c)(5) [labor organizations]; *id.*, § 501(c)(7) [social clubs]; *id.*, § 501(c)(8) [fraternal organizations].) Additionally, the assets of the listed organizations generally are not subject to probate administration when their individual members die. Here, there is no suggestion that Enterprises qualified for tax exempt status, and the three recording contracts at issue were probated as part of Crosby's estate. Nonetheless, such circumstances do not necessarily foreclose HLC's privilege claim because the comment to section 951 does not purport to limit availability of the attorney-client privilege to only those unincorporated organizations specifically listed.

■ A core statutory concept is controlling on the matter, however. That is, even assuming an unincorporated business organization may consist of an individual and his employees working together to further the individual's business affairs, the Evidence Code makes clear that the attorney-client privilege belongs only to the client, whether the client is a natural person, an unincorporated organization, or some other entity. (§ 951; see *Smith v. Laguna Sur Villas Community Assn., supra,* 79 Cal.App.4th at pp. 643–645.) Thus, the validity of HLC's claim that it holds the attorney-client privilege as Enterprises' successor depends on whether Enterprises itself, *as opposed to Crosby or any other of its supposed individual members,* was the original

client and privilege holder with respect to the 59 written communications at issue.[5]

Here, the trial court found that Crosby, the natural person, not Enterprises or any other business organization, was the client who sought the legal advice reflected in the 59 documents. As a reviewing court, we may not disturb the trial court's finding if there is any substantial evidence to support it. (*Gionis, supra*, 9 Cal.4th at p. 1208; *Chadbourne, supra*, 60 Cal.2d at p. 729.)

Our review of the record discloses the following evidence regarding Crosby's identity as the client whose communications with various attorneys are at issue. According to the sworn declaration of HLC's counsel of record, Mark A. Brodka, "Crosby was a 'business machine' " who had business interests in a number of fields including entertainment, mining, oil, real estate, and other ventures. With regard to the three recording contracts at issue in this litigation, there appears no dispute that Crosby signed them in his individual capacity, rather than in a representative capacity on behalf of Enterprises or some other organization. The record also confirms that, after Crosby died, his many business assets and interests, including the three recording contracts, were probated as part of his estate.

The record shows that the key person responsible for managing Crosby's business interests throughout Crosby's lifetime, Grillo, believed he was hired to work for Crosby "as an individual." As Grillo stated in his deposition testimony, the "Enterprises" moniker was "just a loose terminology" to "cover everything that [Crosby] did." Although Grillo also claimed that Enterprises had employed him, Mozelle Seger, Nancy Briggs, and others at the time of Crosby's death, the record contains no evidence that any source other than Crosby himself paid their salaries and benefits. Indeed, the court files of Crosby's probated estate contained an order showing that, after Crosby's death, his estate made employment termination payments to Seger and Briggs and paid their health and life insurance premiums.[6] All this supports the conclusion that Crosby acted in an individual capacity in running his business affairs, not in any representative capacity on behalf of an entity with independent interests or an organization representing the collective interests of Crosby and other members.

Finally, the record indicates the attorneys listed on HLC's privilege logs as authors or recipients of the 59 withheld documents regarded Crosby as the

---

[5] For purposes of our analysis, we shall assume the 59 documents reflect confidential attorney-client communications.

[6] That order also approved the executor's first and final account and report, in which the executor described Grillo as "Mr. Crosby's former business manager" and indicated the estate had incurred expenses to retain Grillo "to advise [the executor] with respect to a variety of matters pertaining to the estate." The executor's report also described the office located at 170 North Robertson Boulevard, where Enterprises operated, as "Mr. Crosby's business office."

client they represented. Referring to the logs, Brodka declared: "Members of the [O'Melveny & Meyers] firm *who represented Crosby* included: John O'Melveny, Richard C. Bergen, and Donald Petroni. Additional attorneys *who represented Crosby or whom Crosby consulted with* were, among others: Thomas O'Sullivan, Stewart Schwartz, George Foley, Todd Johnson and B. Beck." (Italics added.) Similarly, Grillo testified in his deposition that John O'Melveny and Todd Johnson "represented Crosby" and hired Grillo "for" Crosby. Thomas O'Sullivan, a tax attorney, indicated in his deposition that he did tax planning and prepared state and federal income tax returns for both Crosby and Bing Crosby Productions, but not Enterprises.[7] Notably, none of these attorneys claimed to have performed separate legal work on behalf of Enterprises.[8]

In sum, the record contains substantial evidence supporting the trial court's determination that a natural person, Crosby, was the original client who held the attorney-client privilege for the communications pertaining to his three recording contracts. Likewise, the evidence fails to demonstrate, as a matter of law, that Enterprises was the client of the named attorneys with interests of its own or its collective members to protect. (See *Gionis*, *supra*, 9 Cal.4th at p. 1208; *Chadbourne*, *supra*, 60 Cal.2d at p. 729.) HLC offers no authority suggesting that Crosby himself could not be the client on whose behalf those attorneys were consulted, merely because he employed others to assist him in managing his business interests and assets. (See § 951 [" 'client' means a person who, directly *or through an authorized representative*, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity" (italics added)].) Accordingly, we shall not disturb the trial court's determination.

To support its claim of privilege, HLC relies on several cases involving trusts and/or incorporated organizations to argue that control over the assets of a business organization brings with it the right to assert the attorney-client privilege. HLC's authorities, however, merely hold or recognize that when corporate organizations are merged or when control of a corporation or formalized trust passes to new management, the power to assert or waive the privilege resides in the new managers. (E.g., *Commodity Futures Trading Comm'n v. Weintraub* (1985) 471 U.S. 343, 354 [85 L.Ed.2d 372, 105 S.Ct. 1986] [trustee of a corporation in bankruptcy has power to waive the

---

[7] O'Sullivan described Bing Crosby Productions as a corporation engaged in motion picture and television production. For purposes of the matter before us, HLC is not claiming an attorney-client privilege with respect to communications involving Bing Crosby Productions.

[8] Although HLC's privilege logs purport to represent that many of the withheld documents reflect communications between attorneys and agents of both Crosby and Enterprises (e.g., Grillo), HLC clarified at oral argument that it contends only one attorney-client privilege is at issue here. That is, HLC is not claiming there was more than one client holding the privilege when the subject communications were made.

corporation's attorney-client privilege with respect to prebankruptcy communications]; *Moeller v. Superior Court, supra,* 16 Cal.4th at p. 1127 [successor trustee of a private express trust assumes all powers of a predecessor trustee and is entitled to access to trust documents reflecting confidential communications between the predecessor trustee and its attorney on matters of trust administration]; *Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 98–99 [185 Cal.Rptr. 97] [corporation's attorney-client privilege passed to successor in interest through merger]; *Pilates, Inc. v. Georgetown Bodyworks* (D.D.C. 2000) 201 F.R.D. 261, 263–264 [plaintiff was not entitled to assert the attorney-client privilege where it acquired no stock and obtained no control of the corporate client, but merely obtained two of the client's trademarks through an assignment].) Because there is substantial evidence in the record that Crosby, a natural person, initially held the privilege, we find these decisions, which pertain to invocations or waivers of a trust's or a business entity's privilege, inapposite.

### B. *Who May Succeed to the Attorney-client Privilege?*

We now consider whether the Evidence Code permits HLC to succeed to Crosby's attorney-client privilege.

■ We begin with a review of the relevant Evidence Code provisions. Section 953 states without qualification that the holder of a deceased client's attorney-client privilege is the client's personal representative. (§ 953, subd. (c).) Section 954 specifies that, except as otherwise provided by statute, the privilege may be claimed only by a holder of the privilege (*id.,* subd. (a)), by a person whom the holder authorizes to claim the privilege (*id.,* subd. (b)), or by the person who was the attorney at the time of the confidential communication, so long as a privilege holder exists and has not authorized disclosure (*id.,* subd. (c)). Taken together, these two sections unambiguously provide that only a personal representative may claim the attorney-client privilege in the case of a deceased client.

In a comment to section 954, the Commission states: "the privilege ceases to exist when the client's estate is finally distributed and his personal representative is discharged." (Com. com., 29B pt. 3 West's Ann. Evid. Code, *supra,* foll. § 954, p. 232.) According to the comment, the Commission proposed this limitation after carefully weighing competing policy concerns: "Although there is good reason for maintaining the privilege while the estate is being administered—particularly if the estate is involved in litigation— there is little reason to preserve secrecy at the expense of excluding relevant evidence after the estate is wound up and the representative is discharged." (*Ibid.*) Here, the Commission's comments confirm the plain meaning of the statutory provisions: the attorney-client privilege of a natural person transfers

to the personal representative after the client's death, and the privilege thereafter terminates when there is no personal representative to claim it.

█ These statutory provisions dictate the outcome in the matter before us. When Crosby died, his privilege transferred to his personal representative, i.e., the executor of his estate. But once Crosby's estate was finally distributed and his personal representative discharged, the privilege terminated because there was no longer any privilege holder statutorily authorized to assert it. (§ 953, subd. (c); Com. com., 29B pt. 3 West's Ann. Evid. Code, *supra*, foll. § 954, pp. 231–232.) Accordingly, HLC's privilege claim is without merit.

In arguing to the contrary, HLC contends that, even assuming Crosby individually held the attorney-client privilege with respect to the withheld documents, an estate also qualifies as an "organization" within the meaning of section 953, subdivision (d), so as to render it capable of holding and then validly transferring the decedent's privilege, along with his assets, to a "successor." HLC finds it significant that an estate is considered an organization for purposes of the California Uniform Commercial Code (Cal. U. Com. Code, § 1201, subd. (28); see also *id.*, § 9503; Cal. U. Com. Code com. 2, 23B pt. 2 West's Ann. U. Com. Code (2002 ed.) foll. § 9503, pp. 534–535 [financing statement requirements for perfecting a security interest or agricultural lien]) and other California statutes (Gov. Code, § 6161, subd. (f) [State Payment Card Act]). HLC reasons that, because it acquired all of the estate's rights to Crosby's recordings pursuant to a limited partnership agreement, HLC validly holds the privilege under section 953, subdivision (d), as a successor to the estate.[9]

We are not convinced. As discussed, the Evidence Code addresses the matter of estates in section 953, subdivision (c), which expressly limits the holder of the attorney-client privilege in cases of a deceased client to the personal representative. (See also Com. com., 29B pt. 3 West's Ann. Evid. Code, *supra*, foll. § 954, p. 232 [addressing termination of a deceased client's privilege].) Estates are not listed and do not logically belong in section 953, subdivision (d), where provision is made for the privilege to survive when the client is not a natural person and no longer exists. Were we to adopt HLC's position, the attorney-client privilege of natural persons would survive distribution of their estates and would extend to persons and entities beyond their

---

[9] At the trial court hearing on this matter, HLC argued that HLC Properties was a successor in interest to Crosby's estate, which had succeeded to the privilege Crosby held as an individual: "The purpose of [section] 953 [subdivision] (d) is to clearly permit a successor in interest from the entity. And the precise answer to your question, what was the predecessor of HLC, the predecessor of HLC was the estate of Bing Crosby. The entity. Which under [section] 953 [subdivision] (c) succeeded to the individual privilege of Crosby."

personal representatives. Regardless whether other statutory schemes categorize estates as organizations for other distinct legislative purposes, our doing so here would nullify section 953's specific limitation on who may hold the privilege "if the client is dead." (§ 953, subd. (c).) It also would defeat the legislative mandate calling for the privilege to terminate when a client has died, the personal representative has been discharged, and there is no longer anyone to hold the privilege. (*Ibid.*; § 954, subd. (a); see Com. com., 29B pt. 3 West's Ann. Evid. Code, *supra*, foll. § 954, pp. 231–232.) We therefore decline HLC's invitation to construe the term "organization," as it appears in section 953, subdivision (d), to include an estate.

HLC additionally contends its position is supported by Probate Code section 9760, which authorizes a personal representative to continue the operation of a decedent's wholly or partly owned unincorporated nonpartnership business, subject to certain restrictions, if "it is to the advantage of the estate and in the best interest of the interested persons." (Prob. Code, § 9760, subd. (b).) We do not agree.

█ The authority conferred in Probate Code section 9760 complements section 953, subdivision (c)'s grant of authority to the personal representative to assert or waive the attorney-client privilege while the decedent's estate is being administered. (See Com. com., 29B pt. 3 West's Ann. Evid. Code, *supra*, foll. § 953, p. 230 [commenting that section 953 represents a "change in California law," which formerly recognized the privilege "even when it would be clearly to the interest of the estate of the deceased client to waive it"].) If anything, the fact that the Evidence Code recognizes no exception to termination of a decedent's privilege when the personal representative is discharged, even though the Probate Code specifically authorizes a personal representative to operate the decedent's unincorporated nonpartnership business, undermines the position that termination of a decedent's privilege depends on the personal representative's activities in administering an estate.

█ Finally, HLC argues that "[f]ailing to find that Enterprises is the holder of the privilege may lead to the unfair and anomalous result of allowing MCA to view documents that were clearly attorney-client privileged when made, while MCA withholds as privileged its documents relating to the same agreements at issue." The argument fails to persuade. It is well settled that "[t]he privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them or to recognize implied exceptions." (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206 [91 Cal.Rptr.2d 716, 990 P.2d 591], and cases cited.) This rule precludes judicial expansion of the attorney-client privilege in cases where, as here, contracts between an individual and a corporate entity give rise to disputes between those asserting rights under such contracts.

## Conclusion and Disposition

In closing, we do not suggest that entities formed to manage the business affairs of a natural person can never be clients or never hold attorney-client privileges in their own right. Nor do we find that a personal representative's assertion of the privilege categorically forecloses others from claiming it as to the same communications. But the Evidence Code unmistakably provides that the attorney-client privilege belongs only to the client, whether the client is a natural person or a business entity, and the record here amply supports the trial court's determination that Crosby, not Enterprises, was the original client and holder of the privilege with respect to the 59 withheld documents. Under these circumstances, the Evidence Code compels us to find that, when Crosby died, his privilege transferred to the executor of his estate and thereafter ceased to exist upon the executor's discharge.

We reverse the judgment of the Court of Appeal, and remand the matter to that court for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Petitioners' petition for a rehearing was denied April 13, 2005.