Filed 7/15/22 P. v. Austin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD LEE AUSTIN, JR.,<br><br>    Defendant and Appellant. | G060071<br><br>(Super. Ct. No. 17HF0498)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Jonathan S. Fish and Michael J. Cassidy, Judges. Affirmed as modified.

George L. Schraer for Defendant and Appellant.

Rob Bonta, Attorney General, Melissa Mandel, Robin Urbanski, Donald W. Ostertag and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Richard Lee Austin, Jr., appeals from the judgment, in which he was convicted of attempted premeditated and deliberate murder, attempted kidnapping, stalking, and unlawful tampering with a vehicle. He raises four contentions on appeal: (1) the evidence was insufficient to support his conviction for attempted murder; (2) there was insufficient evidence to support his conviction for attempted kidnapping; (3) the trial court committed reversible error by denying his motions to exclude recorded jail phone calls between himself and his wife; and (4) the trial court erred by failing to award him presentence conduct credits. We agree with his last contention and accordingly modify the judgment to reflect 214 days of presentence conduct credits. In all other respects, we affirm the judgment.

FACTS

I. *Procedural History*

In an information, defendant was charged with the attempted deliberate and premeditated murder of L.L. (§§ 187, subd. (a), 664, subd. (a); count 1),[1] attempted kidnapping of L.L. (§§ 207, subd. (a), 664, subd. (a); count 2), stalking (§ 646.9, subd. (a); count 3); assault with a deadly weapon upon Nathaniel P. (§ 245, subd. (a)(1); count 4), and unlawful tampering with a vehicle (Veh. Code, § 10852; count 5). The prosecution also alleged defendant was armed with a firearm in the commission of the offenses charged in counts 1 through 3. (§ 12022, subd. (a)(1).)

A jury trial was conducted before Judge Pham (first trial), and defendant was convicted of attempted kidnapping, stalking, and unlawful tampering with a vehicle. The jury also found defendant was armed with a firearm during the commission of the kidnapping and stalking offenses. Defendant was found not guilty of the assault charge. The jury was unable to reach a verdict on the attempted murder charge, and the court declared a mistrial on that count.

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

The district attorney elected to retry the attempted murder charge. The second jury trial was presided over by Judge Fish. Again, the jury was unable to reach a unanimous verdict on the attempted murder charge, and the court declared a mistrial.

In the third jury trial, presided over by Judge Cassidy, the jury convicted defendant of attempted murder and found true the premeditation and deliberation allegation. The jury further found defendant was armed with a firearm during the commission of the offense.

The court imposed an indeterminate sentence of life with the possibility of parole for the attempted premeditated murder and imposed a consecutive one-year term for the firearm enhancement. The court imposed four years for the attempted kidnapping conviction and three years for the stalking conviction and added a one-year term on each for the firearm enhancement. But the court stayed the sentences for attempted kidnapping and stalking pursuant to section 654. The court suspended the sentence on defendant's misdemeanor conviction for unlawful tampering with a vehicle. While the court awarded defendant credit for 1,428 days in actual custody, it did not give him any presentence conduct credits.

II. *Substantive Facts*

A. *Prosecution's Evidence*

In 2017, attorney L.L. worked in a law firm housed on two floors of a large office building in Newport Beach. L.L. was out of the office on Friday, March 31, 2017, when the firm's receptionist, B.M., received a phone call from defendant, who was in Albuquerque, New Mexico. Defendant gave a false name, Robert Brown, and asked when L.L. would be in the office. He said he was a Chicago attorney and wanted to meet with L.L. to talk to her about working on a high profile case with him in California. When B.M. offered to transfer the call to L.L.'s secretary, he declined the offer. He said he was in a hurry and hung up without leaving any contact information. B.M. sent L.L.

3

an e-mail recounting the phone call. She indicated she told the caller to try again the next business day.

Anticipating L.L. would be in the office the following week, defendant traveled to California with a pistol registered to him and zip ties large enough to restrain a person, which he purchased before leaving New Mexico. He rented a car in Los Angeles on April 1, 2017. Later that day, he checked into a hotel in Costa Mesa.

The next day, defendant surveilled L.L.'s office building and went to a shooting range in Mission Viejo.

On Monday, April 3, 2017, L.L. was again out of the office. B.M. received another phone call from defendant, who again falsely identified himself as Robert Brown. He gave her the same story about being an attorney and needing to meet with L.L. to discuss a case. He wanted to know if L.L. would be in the office the following day and became irritated when B.M. did not know. Defendant did not want to speak to L.L.'s secretary and refused to leave his contact information. Instead, he hung up. B.M. sent L.L. an e-mail chronicling this phone call.

On Monday, defendant purchased a gas can and a lighter. He checked out of his hotel about 3:00 a.m. on April 4th.

Shortly after 7:30 a.m. on April 4, 2017, defendant entered the office building where L.L.'s law firm was located. He was wearing a disguise — a long brown wig and big black sunglasses. He sat in a chair in the lobby. He had his face behind a newspaper, but would glance surreptitiously at people entering the building, especially women. He had a briefcase and a black bag with him.

One building tenant found defendant's appearance and behavior to be very suspicious. She notified building security and called the police department's nonemergency line to report a suspicious man in the lobby. Building security contacted defendant in the lobby and defendant said he was waiting for an attorney. About 9:30

4

a.m., nearly two hours after he entered the building, security escorted defendant from the property because of multiple tenant complaints about his presence.

L.L. arrived at the office later that morning and parked in the building's attached parking structure. That afternoon, defendant called L.L.'s firm and asked if she was in the office. Defendant did not identify himself, but B.M. recognized his voice as that of the man who had previously identified himself as Robert Brown. After B.M. indicated L.L. was in the office, defendant hung up.

B.M. had an uneasy feeling and went to talk to L.L. about the phone calls she had received. B.M. explained she suspected Robert Brown was not who he said he was. She relayed his most recent call, in which he had said he just wanted to make sure L.L. was in and then hung up. At L.L.'s request, B.M. checked the phone's caller identification. She informed L.L. it showed the caller was Richard Austin, Jr.

L.L. immediately recognized the name and became frightened. She had been involved in litigation in four prior civil cases involving defendant and his wife and their insurance company. L.L. had represented the interests of the insurance company in these cases. One of the cases went to trial and L.L. obtained a money judgment in favor of the insurance company, which was subsequently upheld on appeal. Defendant's behavior during the litigation alarmed L.L. Once after a settlement conference, defendant got "in her face" and yelled at her. Defendant's attorney ushered him out of the courtroom, and the bailiff escorted L.L. out through the back of the courthouse. During the appeal, defendant wrote letters with derogatory statements about L.L. and sent them to partners at the law firm where she was working at that time. L.L. had not heard from defendant once the litigation ended around April 2016.

As a result of the past contact, L.L. instructed B.M. to lock their office suite door and call building security. L.L. contacted the insurance company and learned defendant was now living in New Mexico. B.M. checked the caller identification for Monday's call and discovered the call came from a nearby hotel. When B.M. called the

hotel, she was informed a man named Richard Austin had checked out of the hotel earlier that day. L.L. was terrified as she believed defendant was coming for her.

Shortly after 4:00 p.m., L.L. was escorted to her car by four men from her office, including Nathaniel P. (Nathaniel) and Matthew R. (Matthew). They accompanied her in the elevator down from their office and through the building lobby to the parking garage. At the parking garage, one of the men climbed the stairs to the second floor, while the rest took the elevator to the second floor where L.L.'s car was parked. As Nathaniel exited the elevator with L.L. and the others, he saw defendant standing by the stairwell. Defendant was wearing a blue jacket, a baseball cap, and sunglasses. His hands were not visible as he had what appeared to be blue medical scrubs draped over them. When Nathaniel looked at defendant, defendant turned away and pulled down his cap to cover his face.

As the group walked with L.L. toward her car and away from the stairwell, Nathaniel fell back and walked toward the stairwell. Defendant remained standing by the stairwell, looking in the direction L.L. and her escorts had walked. Nathaniel noticed defendant was fidgeting with his hands underneath the scrubs. As Nathaniel approached him, defendant turned away. Nathaniel started walking back to the group, while keeping an eye on defendant. When he saw defendant peek around the corner in L.L.'s direction, Nathaniel shouted, "That's him."

Defendant turned and ran down the stairwell. Nathaniel and Matthew chased after him. Defendant got into a car parked on the first floor of the parking structure and drove toward the exit. At the exit, he drove through the parking gate arm and broke it. Nathaniel ran after the car and was able to obtain the license plate number, which he later gave to the police.

Sergeant Vincelet with the Newport Beach Police Department was assigned to the case and obtained defendant's cell phone records, as well as information from the car rental agency, the hotel in Costa Mesa, and the shooting range. Defendant's rental car

6

was similar to the one seen at L.L.'s office building, except for the license plate number. The license plate number provided by Nathaniel was not the same as that on the car when defendant rented it on April 1st or drove it on April 2nd. The license plate on defendant's rental car when he sped away from L.L.'s office building on April 4th, had been reported stolen from a car at the Orange County airport that day.

Defendant's cell phone records showed after the incident at L.L.'s office, he returned to Albuquerque. Vincelet obtained a warrant for defendant's arrest and traveled to Albuquerque on April 17th. Once there, with the assistance of Albuquerque law enforcement, he searched defendant's residence pursuant to a search warrant. In conducting the search, police discovered a .45-caliber handgun registered to defendant in the master bedroom. The gun was loaded and another magazine loaded with ammunition was next to it inside a gun case. They also found a briefcase that matched the one defendant was seen with at L.L.'s office building. In the briefcase, they found the owner's manual for defendant's handgun, a box of ammunition, packages of large zip ties, and a police scanner. A Los Angeles area newspaper dated April 4, 2017, was also found in the briefcase, further evidence defendant had the briefcase with him on his trip.

Additional evidence was found in the search of defendant's residence. In his wallet, defendant had a handwritten note with the phone number for a wig shop. The police also discovered a receipt for the purchase of the zip ties and duct tape in Albuquerque on March 31, 2017, and a receipt for the purchase of a gas can and a lighter in Costa Mesa on April 3, 2017. Clothes and shoes matching those defendant was wearing on April 4th were also obtained.

Defendant was arrested on April 20, 2017, following the search of his residence, and he remained in custody in New Mexico until he was extradited to California in late May. While he was in custody in New Mexico, he placed numerous telephone calls to his wife from the jail. The prosecution played recordings of three

7

phone conversations between defendant and his wife. At the beginning of each call was an advisement the call was "subject to recording and monitoring."

In a call on April 22, defendant told his wife about his police interview and the police theory he intended to kill L.L. Defendant stated he blamed L.L. and another woman for his pancreatic cancer. He accused them of killing him with their lies. He claimed he was falsely arrested in 2008 and this caused him to drink more, resulting in his pancreatic cancer. He stated the justice system was broken and "you have to take justice into your own hands sometimes." Defendant said he did not care who was listening to their conversation. He expressed hope their conversation would be played in court and then he made a derogatory comment directly at L.L. He commented, "Shakespeare had it right. First thing we do is kill all the attorneys."

In the call on April 25, defendant told his wife about the evidence they had against him before stating his case was "unwinnable." In the call on May 18, defendant stated he messed up, continuing: "when I saw those five people I should have, I should have just said, to hell, to hell with the little boys and the fathers, I'm gonna shoot them up. Ya know, I should have . . . I . . . that's what I should have done. But I had a moment of conscience, okay. And, ya know, gee all these innocent people that are standing around, I'm not really after them."

## DISCUSSION

### I. *Sufficiency of the Evidence Claims*

Defendant contends the evidence was insufficient to support his convictions for attempted murder and attempted kidnapping. As to both convictions, he asserts the record does not contain substantial evidence of a direct but ineffectual act toward the commission of the murder or kidnapping of L.L. We disagree with both contentions as we explain below.

8

A. *Applicable Law*

In assessing a claim of insufficient evidence, "'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Here, defendant was convicted of attempting to kidnap and kill L.L. "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Defendant's claims of insufficient evidence focus on the second element—whether there was a direct but ineffectual act toward accomplishing the murder and the kidnapping.

Our Supreme Court has discussed what qualifies as a direct but ineffectual act under the law of attempt: "For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]. However, as we have explained,

9

'[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.' [Citation.] "'[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made.'" [Citation.]

"[¶] . . . [¶]

"Although a definitive test has proved elusive, we have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) This is known as the "slight-acts rule." (*Id.* at p. 10.) In *Decker*, our Supreme Court explained: "The purpose of requiring an overt act is that until such act occurs, one is uncertain whether the intended design will be carried out. When, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act. [Citations.]" (*Id.* at pp. 13-14.)

B. *Sufficient Evidence of Attempted Murder*

Defendant contends his attempted murder conviction must be reversed because his conduct was merely preparatory and did not qualify as a direct but ineffectual act toward the commission of killing L.L. He asserts the evidence was insufficient because he did not draw or point a gun at L.L. or take aim or fire a gun at her. Defendant's argument tries to focus our attention on evidence that did not exist at trial. But in reviewing for sufficiency of the evidence, we must focus on the evidence that did exist. (*People v. Story* (2009) 45 Cal.4th 1282, 1299 [concluding appellate court "erred in focusing on evidence that did not exist rather than on the evidence that did exist"].) When we focus on the evidence before the jury in the third trial, we conclude it was sufficient to support the jury's determination that defendant attempted to murder L.L.

10

Defendant's conduct went beyond mere preparation and planning. He took several direct steps toward the killing of L.L. and was sufficiently close to completing the crime. The evidence showed defendant formulated his plan while he was in New Mexico and then put his plan into action. While in New Mexico on Friday, defendant called L.L.'s office and gave a fake name and story to determine if she would be in the office the following week. He traveled to California with a gun and zip ties. He rented a car and checked into a hotel near L.L.'s office. Over the weekend, he surveilled L.L.'s office building and went to a shooting range. On Monday, he purchased a gas can and lighter. He again called L.L.'s office and gave a fake name and fabricated story to find out if she was in the office. Before arriving at L.L.'s office building on Tuesday morning, defendant stole a license plate off a car at the airport and placed it on his rental car.

He was wearing a disguise when he arrived at L.L.'s office building in the morning. He waited in the building's lobby for nearly two hours, trying to catch her coming into work. Defendant had a briefcase with him; a briefcase police found at his residence two weeks later containing zip ties, the user manual for his gun, and a police scanner. Defendant did not leave the building on his own accord but was escorted out of the building by security. Defendant, however, did not give up and leave the area. After being removed from the building, defendant returned and waited for L.L. in the parking garage. He tried to conceal his identity by wearing a hat and large sunglasses. When L.L. and her entourage exited the elevator in the afternoon, defendant was lurking nearby in the stairwell. Defendant purposefully concealed his hands by draping an article of clothing over them. Although Nathaniel did not see a gun in defendant's hands, the jury could reasonably infer defendant was hiding a gun in his hands when he was standing in the stairwell. Defendant's plan to kill L.L. would have been carried out, but he was deterred by the presence of her four coworkers. Defendant's statement to his wife in one of his jail phone calls confirmed this. Defendant told his wife he "had a moment of conscience" when he saw the four men with L.L. because they were not his intended

11

target.  He regretted his "moment of conscience" and said he should have shot all of them.

Defendant contends his conduct was insufficient to constitute an attempt as a matter of law because he did not draw, point, or fire the gun at L.L.  We disagree.  As our Supreme Court has aptly stated, "the law of attempts would be largely without function if it could not be invoked until the trigger was pulled . . . ."  (*People v. Dillon* (1983) 34 Cal.3d 441, 455 (plur. opn.).)  Defendant took direct steps toward killing L.L.  His failure to take the last step of drawing or firing his gun was not necessary to convict him of attempted murder.  (*People v. Scully* (2021) 11 Cal.5th 542, 584.)

In *People v. Garton* (2018) 4 Cal.5th 485, the Supreme Court stated, "a defendant need not point a gun at an intended victim to be guilty of attempted murder; when a defendant has clearly shown murderous intent, arriving near an intended victim's home or work with a weapon and then waiting for the victim can be attempted murder." (*Id.* at p. 514.)  Given the facts of the case before us, we find the Supreme Court's statement poignant, albeit dicta.  Here, defendant's murderous intent was shown in the preparatory steps he took.  He then put his plan into action, arriving at L.L.'s work while wearing a disguise and armed with a gun.  He waited for her in the lobby for nearly two hours and when forced to leave the building, he waited in the parking garage.  He only abandoned his plan when he saw four men escorting L.L. to her car.  Viewing the entirety of defendant's conduct in the light most favorable to the verdict, we find there was sufficient evidence to convict him of attempted murder.

We recognize the evidence supporting defendant's attempted murder conviction was not overwhelming as the first two juries were unable to reach a unanimous verdict on this charge.  When a defendant contends on appeal that the evidence was insufficient to support his conviction, the role of the appellate court is limited.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)  For an appellate court analyzing a claim of insufficient evidence, "[t]he question is not whether the jury reasonably could

have reached a different conclusion.  Instead, it is whether any reasonable trier of fact could have reached the same conclusion as the jury." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1073; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 278.) Considering all of the evidence presented in the third trial and presuming """"in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence"""" (*People v. Gomez, supra*, 6 Cal.5th at p. 278), we are convinced a reasonable trier of fact could conclude defendant took a direct but ineffectual step toward killing L.L.  We therefore reject defendant's contention the evidence was insufficient to support his attempted murder conviction.

C. *Sufficient Evidence of Attempted Kidnapping*

Defendant makes a similar argument concerning his attempted kidnapping conviction.  He contends because there was no evidence he tried to take or carry away L.L., the evidence was insufficient to support the element of a direct act in attempted kidnapping.  Again, we disagree.  The evidence before the jury in the first trial was sufficient to support its determination defendant attempted to kidnap L.L.

The elements of attempted kidnapping are the specific intent to commit the kidnapping and the commission of a direct but ineffectual act toward accomplishing the kidnapping.  (See § 21a.)  "Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense." (*People v. Medina* (2007) 41 Cal.4th 685, 694.)  Thus, it is not necessary the defendant move the victim to be convicted of attempted kidnapping. (*People v. Cole* (1985) 165 Cal.App.3d 41, 50 [asportation is not an element of attempted kidnapping].)

Here, there was undisputed evidence before the first jury that defendant intended to kidnap L.L. and made direct steps toward that goal.  The first jury heard statements defendant made to the police.  During the police interview, defendant admitting traveling to California and going to L.L.'s office with the intention of forcibly moving her.  He admitted he went to the shooting range and obtained instructions on how

13

to shoot his gun, saying he did so because he wanted to be sure he did not hurt himself. Defendant explained he was wearing a disguise when he went to L.L.'s office building because he believed she would run away if she recognized him. He also admitted taking a license plate from a car at the airport and putting it on his rental car because he did not want to get caught. He confessed he intended to take L.L. to her boss's office at gunpoint and force her boss to fire her. Defendant said he brought the zip ties with him because he did not believe L.L. was going to go willingly to her boss's office.

As defendant admitted to police, he had completed his preparation and had put his plan into action. He had gathered items he needed to kidnap L.L.—a gun, disguise, and zip ties—and was waiting for her at her office building to use them. Defendant's plan was fortuitously interrupted by intervening forces—defendant being escorted from the property, and L.L. being accompanied by four men on her way to her car. Defendant admitted such when he told the police he ran away when he saw L.L. with her coworkers in the parking lot because he realized he had been detected. Viewing the evidence in the light most favorable to the judgment, a reasonable jury could find defendant's actions went beyond mere preparation and were direct but ultimately ineffectual acts to kidnap L.L.

II. *Admission of Defendant's Jail Phone Calls*

Defendant contends the trial court erred by denying his motions to exclude his recorded jail phone conversations with his wife. He asserts the court should have excluded these calls on the ground of attorney-client privilege. We disagree.

At each of defendant's trials, the prosecution introduced into evidence three recorded phone calls defendant made to his wife while he was in jail in New Mexico. At his first trial, defendant objected to the admission of the calls but not on the ground he raises here. Instead, he objected on the ground of marital privilege. Because defendant did not object on the ground of attorney-client privilege, he forfeited his appellate contention concerning the admission of the calls in his first trial. (Evid. Code, § 353; see

14

*People v. Dykes* (2009) 46 Cal.4th 731, 756 [Supreme Court decisions have "established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)

Prior to his third trial, defendant sought to exclude his jail phone calls on the ground they were protected by attorney-client privilege.[2] The court denied the defense motion to exclude the recorded calls, finding there was no expectation of privacy because defendant and his wife were notified at the beginning of each call that it was being recorded. The court also noted defendant acknowledged during one of the calls that he understood the call was being recorded and defendant stated he did not care if people listened to it.

Defendant contends the trial court erred by denying his motion to exclude the recordings of his jail phone calls to his wife because they were inadmissible under New Mexico law. He asserts the admissibility of the evidence should be examined under New Mexico law because he was a resident of New Mexico at the time of the calls, his wife was also a resident and a licensed attorney in the state, and the phone calls occurred while he was in custody in New Mexico. Defendant is mistaken. The California Evidence Code governs the admissibility of evidence in California. (Evid. Code, § 300.) Thus, we examine defendant's claim under our Evidence Code and case law. As defendant seemingly acknowledges, his phone calls were admissible under California law. By using the jail phone system, which warned defendant his calls were recorded and monitored, defendant impliedly consented to the recording of his calls and the recording was lawful. (*People v. Windham* (2006) 145 Cal.App.4th 881, 886-887.)

Although the existence of an attorney-client relationship between defendant and his wife during the recorded calls is questionable, we will assume its existence

---

[2] Defendant also objected on this ground prior to his second trial. Because defendant was not convicted of any offenses in the second trial, we need not address whether the court erred by admitting this evidence at the second trial.

because it is not dispositive to our analysis. A client may assert attorney-client privilege to prevent the disclosure of "a confidential communication" between himself and his lawyer. (Evid. Code, § 954.) Evidence Code section 952 defines a "'confidential communication between client and lawyer'" as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation . . . ." The privilege belongs only to the client. (*HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 62.)

When talking to his wife, defendant knew his conversations were being recorded and monitored. He knew statements he made to his wife were not being transmitted in confidence. Thus, he had no expectation of confidential attorney-client communication. Indeed, in one of his phone calls he stated he did not care who was listening and he made a direct statement to the victim in anticipation the call would be played in court. On this record, we discern no error in the court's admission of defendant's recorded jail phone calls.

III. *Custody Credits*

At sentencing, the court gave defendant credit for his actual days in custody prior to sentencing (1,428 days). The court, however, did not give him any conduct credits because the court believed defendant was not entitled to them having received an indeterminate life sentence. Defendant contends the court erred by failing to award him any presentence conduct credits, and he requests the judgment be modified to reflect 214 days of conduct credits under section 2933.1, subdivision (c). We agree defendant is entitled to the presentence conduct credits.

Defendant received an indeterminate life sentence on his conviction for attempted murder, which is a violent felony. (§ 667.5, subd. (c)(12).) Absent statutory authority to the contrary, a defendant convicted of a violent felony may receive

presence conduct credits not to exceed 15 percent of his actual days in custody. (§§ 4019, 2933.1, subd. (c); see *People v. Thomas* (1999) 21 Cal.4th 1122, 1125.) As there is no statutory authority prohibiting *presentence* conduct credits in defendant's situation, he is entitled to credits under section 2933.1, subdivision (c), even though he received an indeterminate sentence. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461-464.) Accordingly, we will direct the trial court to modify the judgment to reflect 214 days of presentence conduct credits under section 2933.1, subdivision (c).

## DISPOSITION

Defendant is entitled to an award of 214 days of presentence conduct credits. (§ 2933.1, subd. (c).) The trial court is ordered to modify the judgment accordingly. The trial court is further directed to prepare an amended abstract of judgment reflecting the additional credits and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

MARKS, J.*

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17